SETTEGAST et al. v. FLOYD et al.
(No. 463.)

(Court of Civil Appeals of Texas. Beaumont. June 17, 1919.)

1. ADVERSE POSSESSION  ⊂⇒82 — TITLE TO LAND—POSSESSION—REGISTERED DEEDS.

Where plaintiffs had unbroken possession of the land in suit from August, 1909, until September, 1915, for them to perfect title under the five-year statute of limitation (Vernon's Sayles' Ann. Civ. St. 1914, art. 5674), it was not necessary that their deeds be of record; they holding under a deed to their predecessor duly registered within the meaning of the statute.

2. ADVERSE POSSESSION · ⊂⇒94 — FIVE-YEAR STATUTE—PAYMENT OF TAXES ON LAND.

Payment of taxes on the land in suit by plaintiffs for the years held by them, though taxes were not paid every year before becoming delinquent, held a full compliance with the five-year statute of limitations.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Suit by J. J. Settegast and others against A. B. Floyd and others. From judgment for defendants, plaintiffs appeal. Reversed and judgment rendered for plaintiffs.

Homer E. Stephenson and W. P. Neblett, both of Houston, for appellants.

Winston McMahon and A. R. & W. P. Hamblen, all of Houston, for appellees.

WALKER, J. This is a suit in trespass to try title, brought by the appellants against the appellees to recover lots 3 to 8 and 11 to 13 in block 25 of the West Houston addition to the city of Houston. Defendants answered by general denial and plea of not guilty, and by disclaiming lots 11 to 13.

Briefly stated, the facts are as follows: The state brought suit against A. B. Floyd and others, foreclosing a tax lien on the above-described property. This property was sold under this judgment by the sheriff on August 6, 1907, and was bought by Lillian M. Randall. The deed from the sheriff was dated August 6, 1907, and was acknowledged April 29, 1909, and filed for registration on July 6, 1909, and recorded on July 22, 1909. On July 2, 1902, Lillian M. Randall and husband, George A. Randall, executed a power of attorney to B. J. Dodge, empowering him to buy and sell and manage generally property for the Randalls. Acting under this power of attorney, B. J. Dodge, as agent and attorney in fact for Lillian M. Randall and husband, George A. Randall, on July 17, 1909, executed a deed to J. J. Settegast, conveying to him an undivided one-half interest in the above-described property. This deed was not acknowledged until July 16, 1912, and was recorded in July, 1912. Lillian M. Randall and husband, George A. Randall, acting by and through B. J. Dodge as agent and attorney in fact, on the 2d day of May, 1913, executed a deed to Ada J. Dodge, conveying to her all their lands in Harris county, Tex., with an exception not affecting the land involved herein. This deed was acknowledged May 2, 1913, and was filed for record May 15, 1913. B. J. Dodge was agent of his sister, the aforesaid Lillian M. Randall, and her husband, and was also the agent of his mother, the aforesaid Ada J. Dodge, and also acted for J. J. Settegast. The above-described property was bought at tax sale by Dodge for the common benefit of all the parties mentioned and out of their common fund. The parties were at that time buying tax titles and holding them jointly. When the duly acknowledged deed was received from the sheriff as a result of this particular purchase and after it was recorded, Dodge and Settegast fenced the property during August, 1909, placed a tenant on it, and continuously thereafter and up to the date of the suit held it through tenants. During this time Dodge, for the benefit of all of them, and out of funds supplied by each, paid the taxes on the land for each year. Their claim of title was open and notorious. The deed from Lillian M. Randall and husband to J. J. Settegast at the time it was signed was for the purpose of evidencing an interest in J. J. Settegast, but was not acknowledged

for about three years, in order that the grantors might execute a deed and vest the title out of all of them, without the necessity of the signature of J. J. Settegast. Titles to other properties were held the same way. It was agreed between the parties to the suit that J. H. Webster and Chas. O. Wolf were the common source of title. Plaintiff deraigned title no further than the tax proceedings to which neither J. H. Webster nor Chas. O. Wolf was a party. Defendants showed no title from the common source by conveyance, descent, or otherwise, and showed no possession or claim of title in themselves or in any predecessor.

This case was tried before the court without a jury. The defendants offered no testimony. On conclusion of plaintiff's testimony, the court rendered judgment for the defendants, and from this judgment plaintiffs below, appellants here, have brought this case to this court.

Appellants have briefed the case, but the appellees have filed no brief.

The above statement of this case is taken from appellants' brief, and to this statement we add the following, taking it also from appellants' brief:

The testimony of J. J. Settegast, one of the plaintiffs, is to the effect that he purchased the said undivided one-half interest in the said lots from Lillian M. Randall and husband, George A. Randall, by the said deed dated July 17, 1909; that about two weeks after the date of this deed of July 17, 1909, he and B. J. Dodge went out to this property and took some darkies with them, and that he put a fence around the property, and that he leased the property to a Mr. White, for the purpose of pasturing. Mr. Settegast further testified that he and Mr. Dodge and the Randalls made it a practice to buy property some, more or less, at that time. "We did buy different pieces. The Randalls and Mr. Dodge and I went into it jointly; that is, we owned it jointly." He further testified that Mrs. White and an old colored woman were both'his tenants; that they kept up the fences around the premises for the use of it until a part of the property was sold to a man by the name of Houck; and that he bought a house from the Rice Institute and moved the house onto two lots, which he sold to Mr. Houck. He also testified that he authorized Mr. Dodge to pay the taxes on the property, and that he and Mrs. Ada J. Dodge still claim to own the property.

The testimony of B. J. Dodge shows that Dodge had authority from Ada J. Dodge, who was his mother, to pay her taxes, and that he also had authority from Mr. Settegast to pay his taxes; that he and Mr. Settegast took two colored fellows and a wagon out there and put a fence around these lots within a week or ten days after he recorded the deed which he got from the sheriff in 1909, which deed was the deed to Lillian M. Randall from the sheriff, and recorded July 22, 1909, and that he turned over the property, after it was fenced, to Mrs. White, the very day they built the fence, and that there was an old darkey named Ann Haley, who also used it, and, after he sold these two lots to Mr. Houck, that Mr. Houck continued to use lots 3 to 8 as a pasture, and that he (Mr. Houck) used the land in controversy up until the time when Mr. Houck sold out to Mr. Parriot. Mr. Dodge further testified as follows:

"I have paid the taxes on this property as they became due since the time that I purchased it. I have got the receipts to show that I paid the taxes, and I have got the statement from Mr. De George. I rendered this property for taxation. I rendered it as 'B. J. Dodge, Special.' That was the property that was owned by Mr. Settegast and my sister or mother, whichever it was. I was authorized to render it."

Mrs. Lizzie White testified as follows:

"My name is Mrs. Lizzie White. I am acquainted with the property at and adjoining the Reynolds road, that is, the road running to Bellaire, in which Mr. Parriot now lives and on which Mr. Houck did live. I lived on that road. I lived there in 1909, 1910, 1911, 1912, and 1913. I moved out to Lotus, on the Southern Pacific. I moved out there about May, along about the middle of May, 1913. I moved away from this property. I was acquainted with this property back of which Mr. Houck lives there, that lies behind Mr. Parriot's place. That was located on block 25, I believe, on the west of the Reynolds avenue road. I do not mean the place I lived on; the place I lived on was the old Buhler on the left-hand side going out. Mr. Settegast's property was on the left-hand side of the road also, adjoining places.

"I know something about the fences that Mr. Settegast had around these lands. In 1909 my husband had a lot of yearlings that he did not have any pasture for, no grass to keep them, so we could not keep them at home, and he got this pasture from Mr. Settegast to keep them in. There was a fence there, but a few wires down, and my husband fixed the wires up and kept them there until 1912, and we rented a place from Mr. Settegast at Lotus, and we took them out there then, these small yearlings that we did not have any pasture for on the place. That property where we kept our calves and cows does not lie right immediately back of the Parriot place; it adjoins the Houck place. The fence was already there, and my husband repaired it. We kept that fence in fairly good shape from the time we went there until we left, so that the calves could not get out of it, and after we rented this place, Mr. Settegast let Mr. Houck have this pasture to keep his milk cow and his horses in.

"We repaired it at our own cost, to keep from paying rent. Mr. Settegast said if we kept it up we would not have to pay any rent, so we kept it up."

Mrs. Helena Houck testified as follows:

"I am Mrs. Helena Houck. I am the wife of Joseph Houck. I am the same Mrs. Helena Houck that sold lots 11 and 12 in block 25, West Houston, to C. W. Parriot. I lived out there on this block 25. I moved out there the end of July, 1912, I believe, and lived out there until September, 1915. This is the Reynolds road, and this is the street on which my house stood, and there is my house. I conveyed lots 11 and 12, right there, to Mr. Parriot, these two.

"I will take a pencil and indicate where these fences were in 1912 when I went there. This is the street where our house faced. This is Reynolds avenue. Here, somewheres, goes a bayou. Here is one or two or maybe three lots. There was no fence but here, somewhere in the back. There was two or three lots facing on this avenue; I think running as far as what that bayou runs we did not have any fences, and then a fence came along this way from the bayou to what is within about a lot from this street, and ran this way for three or four lots, and then ran this way up to the street, as far as the corner of our fence. We ran back to this line here, 11 and ·12; that is our back line. Where the pasture was, it ran out this way but right back of our house there was no more fence, not right in the back of our house where our lots ended there was no fence, but this fence went like this, and then fenced this up; I indicate that there was a fence at the northwest corner of lot 12, running north about 100 feet to the street, to Avenue M, and then, running west towards Reynolds road about a lot or two, I don't know exactly how many feet that road was towards Reynolds avenue. Then the fence turns south within about 50 feet of Avenue N, and then it turns east again until about two lots from our house, I suppose two lots from our property or three lots, probably, and then comes to Avenue M, to our fence. Then it turns into Avenue M and goes down to adjoin our place. The fence was an inclosure, a wire fence. It was in good shape when we moved there, and then we kept it for our horses and cow; we had the use of it. We stayed there three years and three months, or two months and a half, maybe.

"And all these fences around there that I described were in good shape until after we left there; we left there just after the storm, in 1915, in August, the middle of August, and we just fixed it up on account of our horse then. We fixed it up about a week after the storm, just temporarily; you know the storm had made the ground bad and everything like that; but we fixed it up so that the horse would stay inside, so we would not have to go after the horse all the time. The fence was always in good condition while we were there."

B. J. Dodge further testified:

"Mrs. Randall is my sister. As agent for my sister and her husband, and also as agent for Ada J. Dodge, my mother, I have held this property openly and notoriously as against all owners whatsoever, in conjunction with Mr. Settegast, M. E. Bass, J. O. Davis, or A. B. Floyd have never made any demand on me for the property. I have rendered the property for taxes ever since I got the deed, and we paid the taxes for 1906, 1907, and 1908, too, after we got it. I am sure those are the years."

Appellants' first assignment of error is that the court erred in rendering judgment against the plaintiffs and in favor of the defendants, for the reason that the testimony and all of the testimony in said case showed conclusively that plaintiffs had acquired title to the property in controversy under the five-year statute of limitations as prescribed by the laws of the state.

The second assignment is that the court erred in rendering judgment for the defendants against plaintiffs, because all of the testimony showed conclusively that the plaintiffs have acquired said property by limitation under deeds duly registered, as is required by law, and that plaintiffs have paid all taxes against said property as they accrued, as is required by law.

As these assignments raise the same legal propositions, we will discuss them together. The trial court did not file findings of fact and conclusions of law, and as the appellees have not briefed this case, we do not know on what ground judgment was rendered in favor of the appellees.

Under the undisputed testimony in this case, the appellants had unbroken possession of this property from about the 1st of August, 1909, until September, 1915. It was under fence during all this time, and was used as a pasture by the Whites and the Houcks, as tenants of the appellants. So far as possession is concerned, appellants have fully complied with the five-year statute of limitations.

The deed from the sheriff to Mrs. Lillian M. Randall was recorded July 6, 1909. The deed from Mrs. Randall to Mr. Settegast was not recorded until 1912. The deed from Mrs. Randall to Ada Dodge was recorded in 1913.

[1] In view of these facts, in order for plaintiffs to perfect title under the five-year statute of limitation, it was not necessary that the deeds to them be of record. York v. Hutcheson, 37 Tex. Civ. App. 367, 83 S. W. 895.

In Thompson v. Weisman, 98 Tex. 170, 82 S. W. 503, the Supreme Court, after quoting the statute of five years' limitation, said:

"It will be observed that the statute does not prescribe that the person in possession shall claim under a deed in his own name. A tenant claims under the deed to his landlord, and an heir claims under the deed to his ancestor, yet the possession of either tenant or heir under such deed will support a plea of five-year limitation. Thompson claimed the land for himself under deeds duly registered, and was within the terms of our statute."

In Callen v. Collins, 56 Tex. Civ. App. 626, 120 S. W. 549, it is said:

"It is not necessary that the deed under which the possessor claims should be to him, but all that is required is that he shall hold and claim

under a duly recorded deed, and that the title conveyed by such deed is in fact for the benefit of the claimant"—citing Thompson v. Weisman, supra, and Kirby v. Hayden, 44 Tex. Civ. App. 207, 99 S. W. 746.

Under these authorities, it seems to us appellants were clearly holding under a deed duly registered, within the meaning of the statute.

[2] On the issue of payment of taxes (again quoting from appellants' brief), Mr. Dodge testified as follows:

"I have paid the taxes on this property as they became due since the time that I purchased it. I have got the receipts to show that I paid the taxes, and I have got the statement from Mr. De George. I rendered this property for taxation. I rendered it as 'B. J. Dodge, Special.' That was the property that was owned by Mr. Settegast and my sister or mother, whichever it was. I was authorized to render it."

Plaintiffs introduced in evidence tax receipts No. 11633, signed by Geo. L. Glass, for the year 1909, showing the payment of taxes for that year on lots 3 to 8, block 25, West Houston addition, receipt dated April 2, 1910; also tax receipt No. 12938, signed Geo. L. Glass, for the year 1910, showing the payment of taxes for that year on lots 3 to 8, block 25, West Houston addition, receipt dated January 31, 1911. Plaintiff also introduced tax receipt No. 2964, showing the payment of the taxes for the year 1912 on property rendered as "B. J. Dodge, Special," and including lots 3 to 8, in block 25, involved herein, which receipt is signed by Carl L. Druesedow, tax collector, Harris county, being dated January 21, 1913. Plaintiff also introduced tax receipt No. 3933, showing the payment of taxes for 1915 on the property rendered as "B. J. Dodge, Special," including lots 3 to 8 and 13, in block 25, West Houston, which receipt is signed by Carl L. Druesedow, tax collector, Harris county, Tex., and dated January 24, 1916. Plaintiff introduced in evidence tax receipt No. 3999, showing the payment of taxes for 1916 on property rendered by B. J. Dodge, being lots 3 to 8 and 13 in block 25, West Houston, which receipt is signed by A. R. Miller, tax collector of Harris county, and the date of the payment is shown to be January 31, 1917.

The testimony of Joe De George is as follows:

"I am the deputy in A. R. Miller, the tax collector's office. B. J. Dodge paid the taxes on lots 3 to 8 and 11 to 13 in block 25, West Houston addition for the year 1911, as shown by tax receipt No. 2641, on January 8, 1912. The years 1913 and 1914 were paid on redemption No. 8438 on May 6, 1915."

From this statement from the record, it appears that though appellants have paid

214 S.W.—44

taxes on the property in controversy for the years held by them, the taxes were not paid every year before becoming delinquent.

In Hirsch v. Patton, 49 Tex. Civ. App. 499, 108 S. W. 1015, Judge Reese, speaking for the Court of Civil Appeals for the First District, said:

"We are inclined to think that in order for payment of taxes to be concurrent with possession, use, or cultivation under a recorded deed, such payment must be made for each year with reasonable promptness, either when due or demandable, or within such reasonable time thereafter as is usual and customary in the payment of taxes."

In Fogle v. Baker, 205 S. W. 752, Chief Justice Pleasants, speaking for the same court, said:

"We do not think the decisions of our Supreme Court, or any of our Courts of Civil Appeals, sustain the holding of the trial court that, to acquire title under the five-year statute of limitation it is necessary, not only that there be peaceable and adverse possession and cultivation, use, and enjoyment of the land under a recorded deed, and the payment of taxes thereon, for a period of five successive years, but that the taxes for each of said years must be paid before they become delinquent. There is nothing in the language of the statute that requires that it be given such construction, and it seems to us it would be judicial legislation for the courts to require the taxes to be so paid to entitle the possessor of land to the protection and benefits of the statute. The statute has been uniformly construed by our courts as requiring that the possession and payment of taxes shall concur in the sense that the years for which the taxes are paid must be the five successive years in which the land was occupied, used, and enjoyed under a recorded deed. It has never been held that the taxes for each of these years must be paid during the year in which they became due, or before they became delinquent."

In Houston Oil Co. v. Jordan, 212 S. W. 544, a case decided by this court at this term, in an opinion written by Chief Justice Hightower, the cases above cited were referred to, and their holding approved. Under authority of these cases, we hold that the payment of taxes at the times shown in the above statement was in full compliance with the statute.

As this record shows that the plaintiffs had possession of this property, using and enjoying the same, and paying the taxes thereon and claiming under deeds duly registered for more than five years before this suit was instituted, the court erred in not rendering judgment for them for the land in controversy. It is therefore ordered that the judgment of the trial court be reversed, and judgment here rendered in favor of appellants for the lands in controversy.