CLEMENTS et al. v. TEXAS CO. et al.
(No. 8483.)

(Court of Civil Appeals of Texas. Galveston. Feb. 3, 1925. Rehearing Denied April 16, 1925.)

1. Evidence ⟨⟩178(3) — Secondary evidence properly admitted to establish existence and terms of judgment, record of which was lost or destroyed.

In view of stipulation admitting that W. was alcalde of jurisdiction in 1834, and that records of his court were long since lost or destroyed, secondary evidence was properly admitted to establish existence of judgment of alcalde and of its terms.

2. Judgment ⟨⟩951(4)—Evidence held to show that judgment was pronounced in terms as described in subsequent injunction suit.

Evidence held to show that judgment of alcalde of jurisdiction was pronounced in 1834, and that terms thereof were as described in subsequent suit by judgment creditor to enjoin execution.

3. Judgment ⟨⟩951(4) — Existence of judgment held established as matter of law.

Whether presumption of existence of judgment, 80 years in the past, be considered a rebuttable or conclusive one, the existence of the judgment is established as matter of law, when there is direct evidence of its existence and no evidence to contrary.

4. Judgment ⟨⟩951(4) — Alcalde of jurisdiction held to have had authority to render judgment on March 24, 1834.

In view of decree No. 39 of Coahuila and Texas of June 21, 1827 (1 Gammel's Laws 170), alcalde's court held one of competent jurisdiction to render judgment, and as decree No. 262 of March 4, 1834, creating primary judges,

---

provided in articles 9 and 20 (1 Gammel's Laws, 347–350) that alcaldes should continue to function until primary judges were established, judgment of alcalde's court of March 24, 1834, was valid and sufficient to support execution sale of land.

**5. Evidence ☜11—Judicial notice taken of impossibility of action on decree in 20 days in 1834.**

Judicial notice is taken of impossibility of complying with decree No. 262, states of Coahuila and Texas, relative to appointment of primary judges within 20 days from date it was promulgated in 1834, at point 800 miles from place where promulgated.

**6. International law ☜9—Valid judgment under Mexican government in 1834 not affected by revolution and change of government.**

Valid judgment rendered by court of competent jurisdiction under Mexican government in 1834, held, in view of Const. of Republic, Schedule, § 1, not affected by revolution and change of government.

**7. International law ☜9—Judgment rendered under Mexican rule held not enforceable as such under succeeding sovereignty, but recognized; "process."**

In view of Act of Congress of Republic, December 29, 1837 (1 Gammel's Laws, p. 1462), while judgment rendered under Mexican rule remained civil obligation under Texas Republic, and was not of itself enforceable as judgment under rule of succeeding sovereignty and in its courts, it was recognized by Act of Congress of Republic, Dec. 22, 1836, p. 201; § 10, providing that all process heretofore issued should be returned; "process" being construed to embrace record of judgments.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Process (In Practice).]

**8. Execution ☜70—Properly issued on Mexican judgment without scire facias or other notice.**

Where judgment was rendered under Mexican rule, and in November, 1837, defendant brought suit to enjoin execution, in which injunction was dissolved, defendant having had his day in court, execution could issue without scire facias or other notice required by Act of Congress of the Republic, Dec. 29, 1837 (1 Gammel's Laws, p. 1462).

**9. Evidence ☜82—Proper judgment directing issuance of execution presumed.**

Proper judgment directing issuance of execution can be presumed, where docket recital showed that court took final action in dissolving previously granted injunction, and thereafter clerk issued execution, and for nearly a century title emanating thereunder stood unchallenged.

**10. Evidence ☜92—Persons attacking ancient issuance of execution have burden to prove noncompliance with law.**

As mere absence of orders, judgments, and the like from ancient records does not militate against presumption that execution issued on valid judgment, persons attacking such transactions have burden of proving that there was not compliance with law, though it involves a negative.

**11. Evidence ☜83(6) — Court indulges presumption of omnia rite acta rather than infer that clerk issued execution in name of plaintiff's heirs.**

Although docket described ancient execution as running in name of plaintiff's heirs, court will indulge presumption of omnia rite acta rather than infer that clerk performed invalid and nugatory act.

**12. Judgment ☜682(1), 686—Privies concluded by judgment dissolving injunction against execution.**

Where plaintiffs were privies by inheritance from judgment creditor, and defendants were privies by purchase, judgment rendered in 1838, dissolving injunction against execution, to which their ancestor was a party, held final and res judicata as to validity of execution in name of judgment creditor's heirs.

**13. Execution ☜245 — Judgment debtor, by buying land at execution sale on 12-month bond, estopped himself from attacking title for irregularities prior to sale.**

Judgment debtor, by purchase of land at execution sale on 12-month bond, authorized under Hartley's Dig. art. 1277, estopped himself from attacking title acquired by purchasers under subsequent execution on the bond, for defects or irregularities occurring prior to sale to him, and was precluded from setting up payment of judgment on which execution issued.

**14. Execution ☜233 — "Twelve-month bond" had effect as obligation known to Spanish law, and as summary and consent judgment.**

"Twelve-month bond," under statute effective Jan. 20, 1837 (Hartley's Dig. art. 1277), had double character, first as obligation known to Spanish civil law, and second, as summary statutory judgment, with force and effect of any other judgment of court of competent jurisdiction; it being also a consent judgment.

**15. Execution ☜245—Heirs held not entitled to raise against execution questions ancestor had waived.**

When debtor, whose land was up for execution sale, bought it on 12-month bond, thus waiving irregularities prior to execution, and others have acted on his decision, his heirs and privies could not raise against execution questions ancestor had waived.

**16. Execution ☜319—Description in sheriff's deed held to describe land in controversy; "near."**

Description of land in sheriff's deed as 1,000 acres of land off lower corner of T. league of land above and near town of C, and known as part of headright of T., held to sufficiently indicate the southeast corner of league; "near" being used in relative sense of nearest.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Near.]

---

☜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**17. Execution ⊜319—1,000 acres of land conveyed by sheriff properly taken in form of square. ·**

In view of Act of Congress of Republic 1839, p. 155, § 15, where sheriff's deed on execution conveyed 1,000 acres off corner of T.'s league, land was properly taken in form of square off corner of survey.

**18. Wills ⊜204 — Act vesting district clerk with probate authority in vacation held valid.**

Probate Acts of 1870, 1873, vesting district clerk with probate authority in vacation, *held* valid in view of express authority therefor in Constitution of 1869.

**19. Wills ⊜253—Will held properly probated by district clerk in 1874.**

District clerk acting under Probate Act 1870, §§ 14, 74, 75, 76, 78, 79, 80, 86, and Probate Act 1873, vesting district clerk with probate authority in vacation, instrument appearing in probate records *held* sufficient to show probate of will.

**20. Wills ⊜421—District clerk's order reciting jurisdictional facts on probate of will held conclusive against collateral attack.**

Order of district clerk of September 2, 1874, reciting jurisdictional facts in probate of will under Probate Acts 1870, 1873, *held* conclusive as against collateral attack.

**21. Wills ⊜421—Ancient orders for probate of wills construed to uphold titles emanating thereunder.**

In construing ancient orders for probate of wills, where they are imperfect or vague, controlling effect should be given intention of court as it may reasonably be gathered from entire record of administration, and liberal construction adopted to uphold titles emanating thereunder.

**22. Acknowledgment ⊜20(1)—Active and essential party to instrument not competent to give it authenticity as officer.**

One who identifies himself with transaction by placing his name in face of instrument as active and essential party thereto is not competent to give it authenticity as an officer, whether in fact interested or not.

**23. Acknowledgment ⊜47—Curative act held not to validate defectively acknowledged conveyance of married woman.**

Acts 1907, c. 165, with reference to defective acknowledgments, does not validate conveyance of married woman defectively acknowledged, since it affects defectively acknowledged instruments as evidence, and not as conveyances.

**24. Adverse possession ⊜43(7)—Conveyance held not to break continuity of adverse possession.**

Where claimants under five-year limitation conveyed to corporation whose stock they owned, but continued in possession, and corporation subsequently reconveyed, *held* that there was no break in the claimants' adverse possession.

**25. Adverse possession ⊜44 — Execution of mineral lease by claimants held not to have stopped running of limitations.**

Where possession of claimants was open, notorious, and hostile prior to execution of mineral lease during limitation period, its execution *held* not to have stopped the running of limitations as against third persons.

**26. Adverse possession ⊜44—Effect of severance of mineral and surface estates by trespasser in possession stated.**

Severance of mineral and surface estates by one in possession who has not matured title, does not abandon, limit, or qualify his possession as against true owner out of possession, and possession of severer after severance is still adverse, and if continued will mature title by limitation to entire tract as against disseized owner.

Appeal from District Court, Brazoria County; W. N. Foster, Special Judge. ·

Trespass to try title by Mrs. Sallie J. Clements and others against the Texas Company and others. Judgment for defendant named and others, and plaintiffs and certain cross-defendants bring error. Affirmed.

A. R. Rucks and Elmer P. Stockwell, both of Angleton, for plaintiffs in error Underwood and others.

A. E. Masterson and C. D. Jessup, both of Angleton, J. D. Jackson, of Alvin, Gaines & Gaines and J. T. Loggins, all of Angleton, J. H. Underwood, of Columbia, Elmo Damon and G. W. Currier, of Boston, Mass., and Oliver J. Todd, of Beaumont, for other plaintiffs in error.

Louis J. Wilson, of Angleton, Robt. A. John, T. J. Lawhon, W. H. Wilson, and C. R. Wharton, all of Houston, and H. S. Garrett, of Fort Worth, for defendant in error Texas Co.

David M. Picton, Jr., and Stephen L. Pinckney, both of Houston (Phillips & Townsend, of Dallas, and C. B. Ames, of Oklahoma City, Okl., of counsel), for defendants in error Hogg Heirs.

SEARS, Special Chief Justice. This suit was brought in trespass to try title involving 262.5 acres in the George Tenille league in Brazoria county. The pleadings involved also the question of damages, it being averred that 5,000,000 barrels of oil had been taken by the defendant from the land in controversy. By agreement, the question of damages was held in abeyance pending the outcome as to title.

Due to the amount involved, the case was vigorously contested at every step. The record is of appalling size. From the transcript and statement of facts, some 5,000 pages, and aided by briefs equal in volume, we shall attempt to set out only so much of the salient facts as to render intelligible our holding on the controlling questions in the case.

⊜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The plaintiffs represent five-sixths of the heirs of George Tenille, the original patentee, one of their claims being as such heirs. He was one of Austin's colonists, and the original grant of the headright of which the land in controversy is a part was in evidence. His sole heir was his son, George C. Tenille. George C. Tenille died in Gonzales county, and his will was offered for probate in that county in 1874. By its terms, Tom C. Tenille was constituted residuary devisee. There were specific bequests to plaintiffs, but the land in controversy went to Tom C. Tenille, if title had not passed out of his ancestor, and if the will was validly probated.

On June 26, 1907, Tom C. Tenille executed a deed conveying the land in controversy to one W. G. Liggett, and subsequently Liggett conveyed to plaintiffs, and, contending that the will was not validly probated and asserting that Liggett was an innocent purchaser, plaintiffs also claim under this conveyance. Tom Tenille had, however, two days prior thereto, conveyed the land to the Hogg heirs, one of the sets of defendants herein.

The defendants, the heirs of the late Governor Hogg, and the Texas Company, deraign title from George Tenille by virtue of an execution and sale under a recited judgment of the alcalde, Edwin Waller, rendered March 24, 1834, in a cause entitled Zeno Phillips v. George Tenille, and by numerous mesne conveyances not necessary to be set out here.

The defendants Hogg heirs and the Texas Company also relied on a deed from Tom C. Tenille to the Hogg heirs dated June 24, 1907, or two days prior to that, made by him to Liggett, and later acquired by plaintiffs. These defendants also relied on the several statutes of limitation, and sought to show a possession of the disputed tract running back to 1854.

Certain of the original parties defendant pleaded over against the Hogg heirs and the Texas Company, seeking to recover a four-thirtieths interest. It appears that the Hogg title under the sheriff's deed passed by mesne conveyances into one Mrs. Jane Kaiser. She died intestate in 1897, leaving five brothers and sisters as her heirs. One of these sisters was dead, and was survived by six children. On April 6, 1898, three of such children, Mrs. McFarland, Mrs. Taylor, and Mrs. Roberts, joined by their husbands pro forma, and by their brother, W. T. Williams, made a conveyance of their interest in the land in controversy to Mrs. Ellen Bell, who, in turn, conveyed to Governor Hogg. Mrs. McFarland and the children of Mrs. Roberts and Mrs. Taylor, who will be hereafter called cross-defendants for convenience, assailed the validity of this deed on the ground that the notary, W. T. Williams, being a party grantor in the instrument, was incapable of taking the acknowledgments of his sisters. Defendant Underwood also placed himself in the attitude of plaintiff as against the Hogg heirs

and the Texas Company, seeking to enforce an instrument which, if of any legal effect at all, was an executory contract of sale.

George Tenille lived on the league granted him during the '30's. At various times between 1837 and 1847 he conveyed all of the league except the 2,000 acres acquired by Underwood, a part of which is the land here involved, and a tract called the Bonney tract. It is inferable from the fact that these deeds are executed by him in Brazoria county up until April 1842, that he lived in that county up until that time. Thereafter, the evidence locates him variously in Bastrop, Fayette, and De Witt counties.

By deed dated June 8, 1842, the sheriff of Brazoria county conveyed "1,000 acres of land off the lower corner of the George Tenille league, above and near the town of Columbia, and known as a part of the headright of George Tenille" to one Ammon Underwood, under whom the defendants Hogg and the Texas Company deraign title. The deed recites the issuance of a writ of execution, "in favor of Zeno Phillips' Heirs v. George Tenille and Thomas K. Davis," its levy, advertisement, and sale.

By docket recitals, and by the recitals of a sworn petition, the existence of a judgment by the alcalde, Edwin Waller, rendered March 24, 1834, in favor of Zeno Phillips, against George Tenille, for the sum of $204 with interest from May 21, 1833, was shown. On November 9, 1837, George Tenille filed a suit for an injunction, in which he alleged that Zeno Phillips had recovered a judgment against him, describing the judgment as set out above; that said judgment was rendered on confession of counsel without his authorization, and without any notice to him; that upon said judgment the heirs of Zeno Phillips had caused an execution to issue out of the district court of the Republic; that Zeno Phillips was dead, and no execution could be issued in his name, but must be issued by his administrator; that the judgment, if well obtained, was by an alcalde under the Mexican government, and no execution could issue out of the courts of the Republic without giving him notice to appear at a certain time and place, "and show cause why the judgment should not be revived against him in the district court, and, if no good cause was shown, then and not until then could a judgment be rendered and an execution issued against your orator." Tenille therefore prayed for an injunction, and swore to the petition. An answer was filed traversing this petition.

Only this further docket entry appears:

"No. 62. Geo. Tenille v. Heirs of Zeno Phillips. Injunction. Injunction dissolved at cost of Tenille."

The execution was lost, but the execution docket shows the issuance of the execution Tenille sought to enjoin; and it also shows,

by its reference to "primary costs," that this was the alcalde's judgment.

There were eight executions shown, either the originals or the records thereof in the execution docket. Under the third, which the execution dockets show was issued July 30, 1839, there was a sale, the docket return showing "land sold on 12 months' credit to G. Tenille and his bond is herewith returned." The 12-month bond referred to is lost, but other evidence shows beyond question that T. K. Davis was the surety on said bond.

The execution referred to by the sheriff in his deed to Ammon Underwood has been lost, but the execution docket shows the issuance of an execution on that date. It is numbered 62:

"Zeno Phillips Heirs v. George Tenille, etc. *Amt. of bond* (italics ours) 339.97 costs 2.00."

It shows issuance to the sheriff of Brazoria county. On the execution docket the sheriff's return reads:

"This execution is entitled to a credit of two hundred twenty two 90/100 dollars on principal & costs paid to date."

There were other executions issued for the deficiency, but it is not material to set them out in any detail. It is only necessary to say that they show that Ammon Underwood subsequently acquired the unpaid portion of the judgment of Phillips v. Tenille.

Ammon Underwood, the purchaser of this land at the sheriff's sale, sold to one Alsworth, on January 1, 1854, 345 acres in a rectangle out of the southeast corner of the Tenille league, which includes the land in controversy. On the same day Alsworth acquired by deed 289 acres out of the Bell headright, adjoining the above tract on the south.

Alsworth went into possession, almost at the time, of the contiguous tracts. His son, still living at the time of the trial, testified without contradiction as to the building of houses, slaves' quarters, etc. All the improvement was on the Bell headright portion of the tract, except a field was inclosed by a hedge, portions of which are still standing, which comprehend some 3 acres of the land in the Tenille league, held by Alsworth under his deed from Underwood. From that date to the time of trial there was possession, more or less continuous, and its extent was sometimes augmented and sometimes restricted.

From Alsworth, by some 22 mesne conveyances, this title vested in the Hogg heirs and Texas Company. In addition, there were a number of mortgages, releases, and other instruments affecting the title executed and recorded by the holders of this chain of title. From the date of the sheriff's sale in 1839 until the date of Tom Tenille's conveyance to the Varner Oil Company in 1907, there was no contrary assertion of title, nor claim evidenced by plaintiffs or their ancestors to the land in controversy; and there was an entire absence of any claim on their part to any of the Tenille league until 1904, when Tom Tenille undertook to recover certain other lands comprehended in the sheriff's sales of 1842 and 1847.

George Tenille's sole heir was his son George C. Tenille. He died in 1874, and his will was offered for probate on August 1, 1874, by his widow, Amanda Tenille. Joseph O'Connor was named executor in the will. A file paper of the estate was introduced in evidence, showing proof of the will in proper form by J. Reynolds, one of the subscribing witnesses thereto. This affidavit is dated August 1, 1874, and is indorsed:

"Testimony of John S. Reynolds, Probate of Will of George C. Tenille, entered F, p. 553."

On August 31st Amanda Tenille, filed a petition, signed by her counsel, O'Connor, praying for a temporary administration "with the will of George C. Tenille annexed." In Book F of the Probate Minutes of the county appears the following:

"In vacation Septr. 2nd, 1874. Probate of the Will of George C. Tenille, deceased. Amanda J. Tenille having filed in the office of the District Court of Gonzales County, her petition for the probate of the Will of Geo. C. Tenille, deceased, praying that the same be probated after notice and citation as by law required. And notice and citation having been issued as by law required and no objecting. Personally appeared before the Clerk of the District Court in vacation John S. Reynolds, one of the subscribing witnesses to said will and subscribed the following affidavit."

Then is copied in full the affidavit of Reynolds, which is in the form required by statute, and following it, the will of Tenille is copied in full. On September 11, 1874, an order was entered in said estate, reciting the application of Amanda Tenille for letters of administration with the will annexed, reciting notice and citation as having issued as required by law, and that the executor named in said will had failed to qualify, it ordered the appointment of Amanda Tenille as administratrix of the estate "of said decedent with the will annexed" upon giving bond, etc. Bond was approved, and from then until the cause was dismissed on May 25, 1881, the estate was administered by Amanda Tenille with the will annexed. During that period of seven years, the district court, and later the county court, entered various orders for annual allowance, approved by supplementary inventory, orders referring to claims on the claim docket of said estate, order releasing the administratrix's sureties, and directing the filing of a new bond. In most of these orders she is spoken of as an administratrix with the will annexed.

Other than as set out, there was no judgment admitting the will of Geo. C. Tenille to probate.

The Gonzales county courthouse was destroyed by fire in 1893. All records and papers not contained in the vault thereof were destroyed. A summary of the undisputed testimony of Judge Miller, of that county, who made a most exhaustive study of the situation shows: That Probate Records B, C, H, I, J, K, L, M, N, O, P, Q, R, are in existence, but that if Probate Records A, D, E, F, G were ever in existence they have been destroyed; that many sets of file papers are missing, and some are known to have been destroyed; that there were many references to the following volumes, none of which are now in existence: Probate Minutes, vol. G-2, Book of Exhibits A (a probate record book), Probate Record A and A-2, and references and memoranda in the clerk's handwriting indicate that certain matters in probate from 1871 to 1877 were recorded in these missing volumes; numerous file papers are missing or destroyed; from 1873 to 1876 there are in existence 59 filed papers containing memorandum orders of the clerk entered in vacation, and, of these, but 25 are carried into any now existing minutes; between 1871 and 1873, of 47 such orders only one has been carried into any existing volume, but 12 of the same had been entered in Probate Record G, which is missing; seemingly without any distinction being made, such orders were entered in the minutes, or in a probate record; clerks had to pay for their stationery in those days, and used what came to hand; Probate Docket B was first a docket of the county court in civil cases, then it was used as a probate index, and finally was used as a probate record, the entries in it with reference to the Tenille estate commencing with the September term, 1876.

There was trial by jury, and, at the conclusion of the testimony, the court instructed a verdict for the defendants and against plaintiffs; instructed a verdict in favor of the defendants Hogg heirs and Texas Company as against the claim of cross-defendant Underwood; as between the cross-defendants McFarland et al. and the Hogg heirs and Texas Company, special issues as to five and ten years' limitation were submitted to the jury. Upon the verdict of the jury in favor of the limitation claim of the Hogg heirs and the Texas Company, and the instructed verdict, the court rendered judgment, in favor of the defendants Hogg heirs and Texas Company, and divesting title of plaintiffs and all other defendants.

The plaintiffs filed request for findings of fact and conclusions of law, which was complied with. The case is now before us by writ of error.

All parties, plaintiffs, defendants, and cross-defendants, have filed numerous assignments and cross-assignments of error. They run into the hundreds, and limitation of space precludes a detailed discussion of each.

In no perfunctory spirit we say that the diligence of counsel has been prodigious, and we have given consideration to every point raised. We think, however, the assignments worthy of merit group themselves about four major questions.

[1, 2] 1. The existence and validity of the alcalde's judgment is assailed by numerous assignments from every conceivable angle. There was a stipulation filed to the effect that Edwin Waller was alcalde of the jurisdiction in 1834, and that the records of his court had been long since lost or destroyed. In view of this agreement accounting for the nonproduction of the judgment relied on to support the sheriff's deed, the lower court properly permitted the introduction of secondary evidence to establish the existence of such a judgment and of its terms. Warner v. Sapp (Tex. Civ. App.) 97 S. W. 125; Ruby v. Van Valkenberg, 72 Tex. 459, 10 S. W. 514; Giddings v. Day, 84 Tex. 605, 19 S. W. 682. We think the facts can lead to no other conclusion than that such a judgment was pronounced, and that its terms were as described in the petition for injunction filed by George Tenille.

We approach this question from the standpoint of the rule laid down by Judge Wheeler in Baker v. Coe, 20 Tex. 429:

"Presumptions must be indulged in favor of those proceedings, especially when they are ancient, and titles have been acquired and transmitted under them, or it would indeed be true that time, instead of healing, as it should, the defects of these titles, would gradually undermine, and eventually destroy them."

It is difficult to assume a state of facts which would call more strongly for the indulgence of a presumption of the very existence of the judgment, if this were necessary.

[3] But plaintiff contends that such a presumption is necessary, and that such a presumption is one of fact, and when indulged is for the jury. Academically, this may be true, but such a presumption, having to do with a transaction 80 years in the past, becomes, for all practical purposes, one of law, for generally the great age which raises the presumption also obliterates the evidence which might have overthrown it. It becomes immaterial, in short, whether it be considered a rebuttal or conclusive presumption. So it is in this case. Not only are there facts which give rise to the presumption of the existence of such a judgment, there is also direct evidence of its existence, and, there being an entire absence of evidence to the contrary, whether upon the presumption or upon the uncontroverted direct evidence, it becomes proper to say as a matter of law that such a judgment existed.

[4] 2. The next contention, raised by a group of assignments, assails the validity of the judgment and its sufficiency to support-

the execution and sale. It is asserted that the alcalde had no judicial authority on March 24, 1834, the date of the rendition of the judgment in the case of Phillips v. Tenille.

By decree No. 39 of the state of Coahuila and Texas, promulgated June 21, 1827, it is apparent that the alcalde's court was one of competent jurisdiction to hear and determine such a cause. There are many references to this decree in subsequent promulgations of the Mexican government. The substance of the decree is omitted from the publication of the Laws and Decrees of the State of Coahuila and Texas, had under the Republic; but, in proper sequence, it is noted by title and number in that work (1 Gammel's Laws of Texas, 170).

We entertain no doubt that the sworn translation of decree 39 in the record, and which is a translation from the original in the Bexar Archives, is the code which prevailed at the date of the alcalde's judgment here in controversy. This being true, it is beyond dispute that the alcalde exercised the powers of a judge of first instance. Indeed, this latter court, while elaborately provided for, seems never to have been established in Austin's Colony, at any rate, until just prior to the Revolution and under the terms of decree 262. And decree 39 gives to the alcalde the power to hear and determine a cause such as that of Zeno Phillips v. George Tenille, until the courts of first instance shall have been established.

By decree No. 262, dated March 4, 1834, primary judges were created, and it is contended that Waller, as alcalde, was thereby deprived of the power to render judgment he did on March 24, 1834; that the alcalde's powers were destroyed by that decree. The plain reading of the decree answers the contention. Articles 9 and 20 (1 Gammel's Laws of Texas, 347–350) plainly provide that the alcalde shall continue to function until the primary judges are established.

[5] Was the law transmitted from Monclova and its terms complied with within 20 days from the date it was promulgated? It was provided that "three days from the receipt of this law" the ayuntamiento should convene, make up a list of four names, forward this to the district chief, who should in turn select therefrom one name and return the list to the ayuntamiento, which should thereupon officially appoint the nominee thus chosen. To suppose that all this could be done and the law travel from Monclova to Brazoria—800 miles—in the then state of communication, in 20 days, is absurd. We take judicial notice of the impossibility of this performance; to hold otherwise would do violence to simple common sense. Since the receipt of the law was, under the existing decrees, necessary to put it into effect, it follows that decree 262 had not impaired the function of the alcalde under decree 39 on March 24, 1834.

[6] 3. Being a valid judgment, rendered by a court of competent jurisdiction under the Mexican government, we think it was not affected as a valid obligation by the Révolution and change of government. For in the event of conquest or revolution "the people change their allegiance; their relation to the ancient sovereign is dissolved, but their relations to each other, and their rights of property, remain undisturbed." U. S. v. Percheman, 7 Pet. 51, 8 L. Ed. 604, opinion by Chief Justice Marshall; 15 R. C. L. 115; section 1, Schedule of Constitution of Republic; McMullen v. Hodge, 5 Tex. 34.

[7] 4. It is also true, however, that, while the judgment rendered under the Mexican rule remained a civil obligation under the Texas Republic, it was not of itself enforceable as a judgment under the rule of the succeeding sovereignty and in its courts. It had to be recognized by the new sovereignty. The early lawmakers met this need. Section 10, Act of Congress of the Republic, passed December 22, 1836, page 201, provided that "all process heretobefore issued for an amount of $100 and upwards" should be returned to the first term of the district courts of their counties, respectively. The word "process," as used in a similar early act, has been construed in a much broader sense than is presently understood by that term, and has been held to embrace the records of judgments. Campbell v. Townsend, 26 Tex. 511; Masterson Irrigation Co. v. Foote (Tex. Civ. App.) 163 S. W. 643.

It was so understood by the judges of that early day. At the first term of the district court of Brazoria county, under the Constitution of the Republic in 1837, several orders were spread on the minutes with reference to these alcalde and primary court judgments. The former had been passed to the latter under decree 262. The order recited that, all such cases pending for $100 and upwards having been transferred to the district court, they stand for trial at the next term; that all executions should be turned over to the sheriff and by him returned, and an allowance was made to the clerk of the district court for his services in collecting and arranging papers originally in the primary court, "which have been returned to this court."

Further, where such judgments had been returned to the courts of the Republic, specific provision was made for their enforcement. The act of December 29, 1837, Congress of the Republic (1 Gammel, p. 1462) provided:

"Sec. 1. That where judgments have been heretofore obtained before any alcalde or primary judge and returned as required by law to any of the courts of this Republic, it shall be the duty of said court on the application of the plaintiff, to issue a scire facias or other notice,

summoning the defendant to appear and show cause why execution should not be issued, but no execution shall be issued upon any such judgment, until a scire facias or other notice shall have been issued and served in the usual way, upon the defendant or defendants.".

[8] 5. The records of the district court do not disclose the issuance of "scire facias or other notice." Nor is there found any judgment in cause 62, Geo. Tenille v. Zeno Phillips' Heirs, directing its issuance, other than the docket notation dissolving the injunction theretofore issued against Zeno Phillips' heirs, and which was served on Hill, the administrator of that succession. But this does not void the execution and sale. It affirmatively appears that George Tenille had his day in court, and unsuccessfully attacked an execution on this judgment upon the very ground of lack of notice of its issuance. It would be altogether incorrect to say that his voluntary appearance did not obviate the necessity of issuing scire facias. And under the act quoted a judgment or order directing the issuance of an execution was unnecessary. If, in response to scire facias or other notice, or by voluntary appearance, Tenille showed no grounds for refusing its issuance, it became the duty of the clerk to issue successive writs of execution as a matter of course.

[9, 10] 6. Should it be necessary, however, a proper judgment directing the issuance of the execution can well be presumed. The docket recital shows that the court took final action in dissolving the previously granted injunction. Thereafter the clerk issued an execution. For nearly a century the title emanating thereunder has stood unchallenged; for more than a half century taxes have been paid and acts of ownership, practically unbroken, have been exercised; the time inquired about was one of confusion and loose practice. In such a case every reasonable presumption will be indulged in support of the ancient title. And it must be borne in mind that the mere absence of orders, judgments, and the like from these ancient records does not militate against the presumption. Persons attacking these transactions are put to the duty of proving that there was not compliance with the law, though it involves a negative. Even though it be a rebuttable presumption, the mere probability arising from the absence of the order or judgment does not rebut it. At most, "when applied to these ancient proceedings [it] raises but a remote presumption, which we hold to be subordinate to the violent legal presumption that the judge before whom the proceedings were had did his duty." Baker v. Coe, 20 Tex. 429.

As applicable to many features of the case at bar, and illustrating the various applications of this principle, we cite the following cases: White v. Jones, 67 Tex. 640, 4 S. W. 161; Hudson v. Jurnigan, 39 Tex. 589; Logan v. Pierce, 66 Tex. 126, 18 S. W. 343; Dancy v. Stricklinge, 15 Tex. 557, 560, 65 Am. Dec. 179; Bayne v. Garrett, 17 Tex. 335; Guilford v. Love, 49 Tex. 738; Gallup v. Flood, 46 Tex. Civ. App. 644, 103 S. W. 427; Ludtke v. Bankers' Trust Co. (Tex. Civ. App.) 251 S. W. 602, 605.

[11] Much that has been said applies to the contention that the execution was invalid because issued in the name of Zeno Phillips' heirs. It is earnestly contended that it was issued in this way because of the notation of the style and number on the execution docket and in the sheriff's deed. But it by no means follows that the execution ran in that exact style. Clerks, then as now, used similar abbreviations in their dockets, but they are simply notations for identification in his own records, and may be and usually are elaborated in the writs themselves. In the same docket the clerk uses the abbreviations "et al.," "& Co." Can it be seriously contended that we must therefore find and hold that the writs to which these notations applied ran in exactly similar fashion? To the contrary, under the decisions collated in the foregoing paragraph, we are enjoined to indulge the presumption of omnia rite acta, rather then infer that the clerk performed an invalid and nugatory act.

[12] What merit the argument may have, plaintiffs are not now in a position to raise it. They are privies by inheritance of Geo. Tenille. The defendants Hogg heirs and the Texas Company are privies by purchase. The judgment rendered by the district court of the Republic in 1838, to which their ancestor was a party, was a final one, and, adjudicated adversely the issues raised by Tenille. Bryan v. Knight, 1 Tex. 180–184; Austin v. Townes, 10 Tex. 29; Durant v. Essex Co., 7 Wall. 107, 19 L. Ed. 156.

One of these very issues was the right of Zeno Phillips' heirs to such execution. Under a rule of law so fundamental and universal as to need no citation, this question is res adjudicata. Plaintiffs cannot, after nearly a century, relitigate an issue adjudged against their ancestor and privy in title.

The facts seem to us conclusive that the judgment was rendered; and that it passed, in response to statutes of the Republic, to the district court, and it became, by reason of such statutes, for all practical purposes, a judgment of that court. Apparently it was given the same number and style as the injunction suit filed by Tenille; or both, as would seem reasonable, were carried under the same file number. The first execution of October 21, 1837, certainly referred to the original alcalde judgment which had very evidently been passed to the district court.

(273 S.W.)

The style is the same; the principal is identical in amount; the item of "primary costs 4.62" points unmistakably to the Mexican origin of the judgment to which this docket entry refers. No number is given in the column of the docket reserved for that purpose. Oath of the sheriff is made as to loss of this execution and a new one issued May 2, 1838, which recites levy but that sale was not complied with. Under the next execution there was a sale to Geo. Tenille for which he gave his 12-month bond. The execution docket entries in this instance refer unmistakably, we think, to the same judgment. The names of the parties are identical, save the word "heirs" is written after Zeno Phillips' name; the amount of the judgment is identical. The costs have increased, the two previous executions accounting for that; and in the number column is the number 62. We cannot conceive any facts here which would justify a finding that this meant any other judgment than that of the alcalde, now become a part of the district court's archives.

Similarly, through the execution of November 23, 1840, which was returned not sold for want of bidders, to the execution of April 21, 1842, referred to by the sheriff in his deed, and under which he sold to Underwood, the entries of this ancient execution docket point unerringly to the fact that these executions are issued on the 12-month bond given by Tenille. Thus the amount of principal, interest, and costs in 1839 would be $337, and this is the amount given in both docket entries. Moreover, that of April 21, 1842, specifically states in the column showing "Amount of Execution," "amt. of bond 337.97."

[13] 8. Under an execution issuing out of the district court on the transferred alcalde's judgment, the land in question was purchased by George Tenille, for which he gave his 12-month bond, and under an execution issuing on this bond Ammon Underwood purchased. Thus, Tenille, the judgment debtor, became the purchaser at execution sale. By this action he estopped himself upon the plainest equitable principles from attacking the title he had thus acquired for any defects or irregularities occurring prior to such sale. Pope v. Davenport, 52 Tex. 215; Cornelius v. Burford, 28 Tex. 208, 91 Am. Dec. 309; 16 Cyc. 765, and cases cited. It cut him off, we think, from being heard to say that there were irregularities in the execution, levy, and sale to himself, and it also precludes him from setting up the payment of the judgment. With reference to this last, it is:

"The general rule is believed to be that a purchaser at execution sale, who looks to the record and finds there a valid subsisting judgment authorizing the execution under which the officer proceeds, and who in good faith buys, pays the purchase money and receives a deed, takes a title which is valid until the sale is set aside." Owen v. City of Navasota, 44 Tex. 522, and cases cited.

When Underwood purchased at the subsequent sale, the record would have disclosed a subsisting judgment, because the 12-month bond by its terms, as hereinafter discussed, became such a judgment; it operated as a lien on the land from the date of its execution, and had been placed there by the execution debtor. Certainly there would be nothing in the record to put him on notice of any infirmity by payment or otherwise in this transaction, and it is undisputed by the sheriff's recitals that Underwood paid value at the time of his sale. We believe this is sufficient to characterize him as an innocent purchaser and to make the sale good under the authority of Owen v. City of Navasota, supra, but whether it did or no Tenille is estopped to assert the contrary. Rorer on Judicial Sales (2d Ed.) par. 471; Cayce v. Curtis, Dallam, Dig. 403; Austin v. Townes, 10 Tex. 24; Howard v. North, 5 Tex. 310, 51 Am. Dec. 769.

The case of Townes v. Harris, supra, decides that the 12-month bond did not operate from the date of its execution as a lien on the property of one of the sureties thereon, and that, therefore, a purchaser from the surety took a good title as against a writ of execution issued upon the subsequent forfeiture of the bond. This is the decision, and all that was necessary to the decision. The court remarks, by way of dicta, that if the execution was void, the 12-month bond, to which Waller was security given at sale thereunder, was also void. Without elaboration of the many differences between the rights and liabilities of a surety and those of the principal obligor, who was at the same time the judgment debtor and fully cognizant of whatever infirmities existed, or pointing out that the instrument might be void as to the former and valid, or at most voidable, as to the latter, it is sufficient to say that well settled legal presumptions and the dim facts of this ancient transaction alike repel any idea that the execution under which George Tenille gave his 12-month bond was void.

[14, 15] 9. The 12-month bond was a creature of statute; it became effective January 26, 1839, and is found in article 1277, Hartley's Digest. This provided, in brief, that the bond, with good and sufficient security, should be made payable to the plaintiff and returned to the clerk's office from which the execution had issued, "and shall have the force and effect of a judgment against the principal and securities; and upon the maturity of the bond, if it shall not be punctually paid, execution shall issue thereon against the principal and securities," and contained further provisions as to levy and sale in order to pay the amount of the bond.

It is settled that this bond had a double character, first, as an obligation known to the Spanish civil law, and second, it was a summary statutory judgment, and had by force of the statute "all the force and effect and incidents of any other judgment of a court of competent jurisdiction" (Austin v. Townes, 10 Tex. 24), and it continued to have these characteristics after the adoption of the common law in Texas (Foster v. Champlin, 29 Tex. 28). It is also held such a 12-month bond is, in effect, a consent judgment. For the various cases discussing the incidents of such bonds, see Cayce v. Curtis, Dallam, Dig. p. 403; Bryan v. Knight, 1 Tex. 183; Townes v. Harris, 13 Tex. 514; Janes v. Reynolds, 2 Tex. 253; Austin v. Townes, 10 Tex. 24. We think, considering the nature of this summary judgment, and the fact that it was in effect a consent judgment, it would conclude or waive any preceding errors or defects which might exist in the transactions. When Tenille's land was up for execution sale, if defects existed, his insistence upon them in court was his remedy. He chose instead to buy in his property, and to enter into a consent judgment for the amount therefor. Having made this decision, others having acted upon it and it having been acquiesced in for 85 years, we know of no rule of law which would permit his heirs and privies in title to change their position and raise against it questions their ancestor had waived.

[16] 10. The description in the sheriff's deed, reading "1,000 acres of land off the lower corner of George Tennell's league of land above and near the town of Columbia, and known as a part of the headright of George Tennell," is attacked as not describing the land in controversy, and as having ambiguity in its description. The Tenille league lines run north and south and east and west. The town of West Columbia is south of and a little east of the southeast corner of the league. It was in evidence that the southeast corner is the lower corner with reference to the course of the Brazos river; that is to say, it is farthest downstream. It was also shown that a topographical survey disclosed that the southeast corner was the lowest in elevation on the league, so that whether "lower" be construed to mean south or downstream, or lower in elevation, each would indicate the southeast corner of the Tenille league. This corner is also nearest and above the town of West Columbia. We think, therefore, the facts clearly identify this corner, and we decline to put the construction on the language contended for by plaintiff. It very apparently to us refers to the land conveyed, and is not a description of the whole league. This last would have been futile, because Tenille owned only the one league in the county; and the early Texans were rarely strict grammarians, and we think they used the words "near Columbia" in the relative sense of "nearest Columbia."

[17] 11. This corner was in fact the one settled upon under the deed, and it was laid out in a square. Plaintiff contends that there is no authority in this state under such a description for laying land off in a square, and it is true that Judge Williams seems to question this doctrine in Edrington v. Hermann, 97 Tex. 193, 77 S. W. 408, though he states that the Courts of Civil Appeals have held it as a matter of law, and expressly declines to rule definitely upon the question. Under other jurisdictions, the great weight of authority is that such a description will require the land to be laid off in the form of a square from the corner as a base. Edrington v. Hermann, supra, and cases there cited; Wingo v. Jones (Tex. Civ. App.) 59 S. W. 916; Day v. Needham, 2 Tex. Civ. App. 680, 22 S. W. 103. The Act of 1839, Congress of the Republic, § 15 (Laws 1839, p. 155), required the sheriff to levy as on wild land, and to "take off so much of the land at one corner of the survey" sufficient to satisfy the execution. The only reasonable meaning to be given this statute, it seems to us, is that the land shall be taken off in the form of a square. To take it off in a triangle, or a narrow rectangle, would do violence to common understanding; and might greatly increase or decrease the intrinsic value of the land. We think that the land was properly taken in a square, as a matter of law.

In addition thereto, the evidence disclosed that George Tenille in his lifetime had sold all of the Tenille league other than the Underwood purchases, except for a small tract, and, upon the whole, we conclude that the description, in the light of the statute then in force, and of the extrinsic evidence, is good.

If the proceedings under the alcalde's judgment and subsequent execution and sale are, as we hold, valid, it follows that the action of the lower court in directing a verdict must be sustained, but if we consider, for the sake of argument, that this be not true, the action of the court is sustained upon another proposition.

Tom Tenille was the devisee under the will of George C. Tenille. The record shows that the defendant Hogg heirs and the Texas Company acquired Tom Tenille's title, for we see no facts which would justify a finding that Liggett was an innocent purchaser when he acquired the deed subsequent in point of time from Tom Tenille. If, therefore, the will of George C. Tenille was validly probated, whatever title remained in George Tenille is now vested in the defendants Hogg heirs and the Texas Company.

This will and its probate must be decided

by the Probate Act of 1870 (Laws 1870, c. 81), and the amendment of 1873, (Laws 1873, c. 97), by which probate jurisdiction was vested in the district court, and to a limited extent in the clerk of that court.

[18] 12. Numerous attacks are made on the constitutionality of the act of 1873, investing the district clerk with probate authority in vacation, and upon his jurisdiction. It is not perceived how conferring this power could be unconstitutional, when the Constitution of 1869 expressly authorized the Legislature so to do. Nor does the fact that the Act of 1873 did not set up a complete system for his government impair the powers given the clerk. The act of 1870 did prescribe probate duties and powers in great detail, and the act of 1873 provided that the clerk should be governed by the provisions of the act of 1870 so far as the same were applicable. The constitutionality of this act and the jurisdiction of the clerk to probate wills in vacation are no longer open questions in this state. Fuentes v. McDonald, 85 Tex. 135, 20 S. W. 43; Salmon v. Huff, 9 Tex. Civ. App. 164, 28 S. W. 1044.

[19] 13. The lower court properly found and held that the will of Geo. C. Tenille was probated. The pertinent parts of the act of 1870 under which the clerk acted, "so far as they are applicable," may be thus summarized: Section 14 provided for 10 days' posting; section 78, that the testimony of subscribing witnesses shall be reduced to writing at that time and be signed by them. Section 79, "when the will is proved as provided in sections seventy-four, seventy-five, seventy-six and seventy-eight [in the instant case is was so proved], the court shall make an order to that effect; stating upon what testimony such order is made"; section 80, "The testimony upon which it is determined that a will is proved, both for and against, shall be recorded with the will;" section 86; "The order in such case (which is the same mentioned in section seventy-nine) shall be that the will is proved and ordered to be recorded, and that the executor, naming him, receive letters testamentary * * * upon filing bond," etc.

[20] 14. The clerk's order of September 2, 1874, recited all jurisdictional facts, and this is conclusive against a collateral attack. Salmon v. Huff, supra. He states that the instrument is "probate of the will of 'George C. Tenille, deceased." He recites that Amanda J. Tenille had petitioned that same be probated. It may be observed that he does not state that she prayed for O'Connor's appointment as executor. He was her counsel in this case, and had evidently already refused to act as executor. He follows every requirement of the act in making an order "to that effect" after the will was proved, with the exception (1) he did not appoint an executor, but no application for this is shown, and subsequent orders show that the executor renounced; and (2) he did not order himself to 'record the proceedings, but this requirement could have no application when the clerk himself probated the will. He simply recorded it.

[21] 15. An examination of the cases dealing with collateral attacks on various ancient probate orders, from those under the Probate Act of 1840, to the present, shows: (1) That in construing such ancient orders where they are imperfect or vague, "controlling effect should be given to the intention of the court as it may be reasonably gathered from the entire record of the administration" (McCardell v. Lea, 111 Tex. 387, 235 S. W. 520).; and (2) that in circumstances such as prevail in this case a liberal construction of such orders is to be adopted to uphold titles emanating thereunder (Baxter v. Lynch, 4 Tex. 431; Denison v. Ingram, Dallam, Dig. 520; Cruse v. O'Gwin, 48 Tex. Civ. App. 48, 106 S. W. 759; Neill v. Cody, 26 Tex. 286; Stark v. Osborn, 221 F. 568, 137 C. C. A. 259; Moody v. Butler, 63 Tex. 212; Teague v. Swasey, 46 Tex. Civ. App. 151, 102 S. W. '460; Simmons v. Blanchard, 46 Tex. 269; Moody v. Butler, 63 Tex. 212.

16. At common law, the probate of a will in common form was informal, and, in a measure, interlocutory, because it could be reviewed in a number of ways, and probate in solemn form required. The act of 1873, permitting the clerk to probate in vacation in the absence of a contest, was quite analogous to probate at common law in common form. This was subject to review at the next term of court, or proponents might have to prove up—as in solemn form—by a contest filed within four years. It was not a formal proceeding. It required no judgment, only an "order," a less formal thing. Halbert v. Alford (Tex. Sup.) 16 S. W. 815. An "order to. that effect" prevents the inference that any set form of words should be necessary. In re Wiley's Estate, 187 Pa. 82, 40 A. 981, 67 Am. St. Rep. 569.

In view of this and of the other facts and recitals of the record which we have set out, the age of the transaction, the fact that the devisees took under the will and treated it as a probated paper for nearly 50 years, and guided by the long line of decisions, we overrule all assignments directed to the action of the lower court in this regard.

We consider the instrument relied upon sufficient to probate the will of Geo. C. Tenille; but, if this were not so, in view of the evidence as to loose practice in recording file papers, the destruction of many records, the fact that the court administered on the will as a probated instrument over a period of 7 years, and the other facts recited in the preceding statement herein, we would be inclined to hold that a proper judgment admitting it to probate could well be presumed.

Authorities supra, par. ——. Deeming the order shown sufficient, however, we find it unnecessary to so hold.

[22] 17. Turning now to the case made between the cross-defendants McFarland heirs and the defendants Hogg heirs and the Texas Company, it appears that the court admitted in evidence the deed from Mrs. McFarland and her sisters to Mrs. Bell, the acknowledgment to which was taken by one Williams, who was a party grantor in that instrument, but the lower court also held that this instrument was ineffectual to pass the title of the married women who were grantors therein. By cross-assignment defendants Hogg heirs and Texas Company assailed this ruling. The evidence is not clear as to the position occupied by Williams at the time of this conveyance. He testifies that he had no interest in the land conveyed, yet he also testifies that he received a part of the consideration, and while it is true that he had previously made a conveyance of his interest to Mrs. McFarland, yet this conveyance had not been manually delivered, but had remained in his safe and was not recorded until some time after the transaction in question. But whether he were in fact interested or not, we think it a safe and salutary rule, and one established in this state, that a person who identifies himself with the transaction, by placing his name in the face of an instrument as an active and essential party thereto, is not competent to give it authenticity as an officer. Rothschild v. Daugher, 85 Tex. 332, 20 S. W. 142, 16 L. R. A. 719, 34 Am. St. Rep. 811; Sample v. Irwin, 45 Tex. 568; Brown v. Moore, 38 Tex. 648; Silcock v. Baker, 25 Tex. Civ. App. 508, 61 S. W. 939; Titus v. Johnson, 50 Tex. 236; Belcher v. Taylor (Tex. Com. App.) 212 S. W. 647.

No case precisely like the one at bar has been decided in this state, but we think the facts bring this case within the principles announced in the above decisions, and we are controlled thereby, though the weight of authority in other jurisdictions is seemingly to the effect that a cograntor, though a party to the instrument, is competent to take the acknowledgment of the other parties grantor. Greve v. Echo Oil Co., 8 Cal. App. 275, 96 P. 907; Nichols v. Howson, 94 Ark. 241, 126 S. W. 830; Bank v. Hove, 45 Minn. 40, 47 N. W. 450; Austin v. Southern Co., 122 Ga. 439, 50 S. E. 385; Schwartz v. Woodruff, 132 Mich. 513, 93 N. W. 1067; Dussaume v. Burnett, 5 Iowa, 97.

[23] Nor does the Act of 1907 (Laws 1907, c. 165), with reference to defective acknowledgments, cure the invalidity of this instrument as a conveyance. There are numerous cases under this curative statute with reference to single acknowledgments, and it is universally held that in such cases the act completely removes any objection to the instrument, but this is true because the acknowledgment of a man or a single woman is in no sense a part of the conveyance. It is merely a verification for the record, and for the purposes of evidence of the fact that they have conveyed. But, in the case of a married woman, the acknowledgment is not only that which imparts verity to her act, it is also a vital and essential part of her conveyance. Without it there is no conveyance. The curative act of 1907 dealt with defectively acknowledged instruments from the standpoint of their value as evidence, and was in no sense an attempt on the part of the Legislature to validate such defective instruments as conveyances. Holland v. Votaw, 62 Tex. Civ. App. 91, 130 S. W. 882; Holland v. Votaw, 103 Tex. 534, 131 S. W. 406; Delay v. Truitt (Tex. Civ. App.) 182 S. W. 732; Klumpp v. Stanley, 52 Tex. Civ. App. 239, 113 S. W. 602; March v. Spivy (Tex. Civ. App.) 133 S. W. 528. There are many outside authorities cited by counsel which seem to hold contra, and the case of Downs v. Blount, 170 F. 15, 95 C. C. A. 289, 31 L. R. A. (N. S.) 1076, announces a contrary conclusion, but these cases deal, except for the last one, with statutes whose wording differs from that of ours. For example, the Arkansas validating act provides that instruments on the record, but defectively acknowledged, "shall be held valid to pass the estate which such conveyances purport to transfer." If our Legislature had used this or similar expression, evincing an intent to validate the conveyance, we would be confronted with a different question, but the statute in unmistakable terms limits its operation to the evidentiary character of defective acknowledgments. Such we think is now the settled rule of decision. Holland v. Votaw, supra, and other similar cases. There was no error in the ruling of the lower court on this deed.

Cross-defendants McFarland attacked the finding of the jury on the question of five and ten years' limitation by more than 50 assignments of error. It is manifestly impossible to give detailed consideration in this opinion to each of the questions raised. We find that the court correctly charged the jury on both the five and ten year statutes, and the evidence is abundant, if not overwhelming, to sustain the verdict of the jury with reference to its finding on the ten-year period.

[24] We think the lower court was in error in submitting to the jury the question of five years' limitation only from July 27, 1910, but no injury resulted thereby to cross-defendants McFarland et al. The lower court was apparently of the opinion that the deed from the Hogg heirs to the Varner Oil Company, the stock of which the Hogg heirs owned entirely, broke the possession of the Hoggs. This deed was made in May, 1907,

and the Varner Oil Company reconveyed on July 27, 1910. The facts show unmistakably a privity between the Hoggs and the Varner Oil Company. The possession of the Hoggs during this period can be attributed to nothing else. It would be absurd to say that they, the stockholders and officers of the Varner Oil Company, were in possession of said land in hostility to the Varner Oil Company title. Title had been placed for convenience in the Varner Oil Company. It was holding for the benefit of the Hogg heirs, either individually or in their capacity as sole stockholders and directors of this corporation, and they, the Hoggs, were holding possession for the benefit of the Varner Oil Company. We think the evidence admits no other construction, and this period should not have been deducted from the jury's consideration under the five years' statute. Thomson v. Wiseman, 98 Tex. 173, 82 S. W. 503; Kirby v. Hayden, 44 Tex. Civ. App. 210, 99 S. W. 746; Burnham v. Hardy Oil Co. (Tex. Civ. App.) 147 S. W. 333, 108 Tex. 555, 195 S. W. 1145; Settegast v. Floyd (Tex. Civ. App.) 214 S. W. 686.

[25] During the period of limitation submitted to the jury, the Hogg heirs executed a mineral lease, by which the surface and the minerals were severed, and it is contended that this broke the running of the statute. The expression is used in many cases in this state to the effect that, after severance of the mineral and surface estate, the possession of one will not ripen into a limitation title to the other. Wallace v. Hoyt (Tex. Civ. App.) 225 S. W. 425; Henderson v. Chesley (Tex. Civ. App.) 229 S. W. 573; Lyles v. Dodge (Tex. Civ. App.) 228 S. W. 316; Luse v. Parmer (Tex. Civ. App.) 221 S. W. 1031. While the language is broad, it will be found that the decisions are confined to cases arising between the severor or his privies and the severee or his privies. The reason for this rule is apparent and twofold. When one severs by mineral lease, for example, his lessee may thereafter attribute any surface possession to the rightful ownership of the person severing; and likewise, where the true owner severs by mineral lease, he would naturally ascribe any drilling operations taking place on the land to the rights which he himself had created in his grant of severance. In other words, possession of either is referable to those acts of the other party in privity as being under the granted or retained estate; and cannot be that open, adverse, hostile possession of which the other owner must take notice. Moreover, as in the case at bar, the severance is usually accomplished by leases or grants with covenants which operate as estoppels by deed upon both severor and severee.

But there is a wide distinction between this class of cases and the case at bar. Neither plaintiffs nor the cross-defendants McFarland et al. have severed, nor are they parties or privies to any severance of estates. The Hogg heirs, in possession under deeds and acts of ownership evincing their hostile claim to the whole fee, have severed, not in favor of plaintiffs or the McFarlands, but to one who, like themselves, is a stranger to plaintiffs' and McFarland's title.

Can it be said that the McFarlands and plaintiffs could have attributed the mineral operations of Hogg's lessee to this severance, which was not executed by them or for their benefit, but by strangers to their title and in hostility to them, and thereby defeat the ripening of a possessory title against themselves? Before the lease which severed was made, if their position is correct, the Hoggs were, as to them, mere trespassers. The Hoggs' possession was hostile, visible, and notorious in its use of the surface; notice to the world that they claimed the fee to this land. When they severed, in addition to the use of the surface, their lessee commenced active exploration for oil. If we apply to such facts the rule contended for by plaintiffs and cross-defendants, we say that the possession of the Hoggs was less open, less notorious, and less hostile before the severance, and would have matured the fee title to both minerals and surface; and yet, after severance, their possession, by reason of the added effort of their lessee becoming more open, more notorious, and more hostile, would not ripen title to either estate. To state the matter is to answer the contention.

[26] The case is one of first impression in this state, but on reason and authorities from other states we hold that the doctrine of Wallace v. Hoyt, supra; Henderson v. Chesley, supra, and others, applies only in cases arising between the parties to the severance or those in privity with them. It would have application, for instance, to a contest between the Hogg heirs and their grantee, Hamman, or the Texas Company because of its privity with Hamman; neither could acquire the other's estate by possession and claim. But a severance by one in possession, who has not yet matured a title, does not abandon, limit, or qualify his possession for the purpose of ripening a title against the true owner out of possession; and that, as against such disseized owner, the continued possession of a trespasser after severance, as before, is adverse, and that such possession continued by either the trespasser or the third person to whom he severs will mature a title by limitation to the entire tract as against such disseized owner. Black Warrior Co. v. West, 170 Ala. 346, 54 So. 201; Moore v. Empire Co., 181 Ala. 344, 61 So. 940; Moore v. Ensign, 131 Ga. 421, 62 S. E. 229; Virginia Coal Co. v. Richmond, 128 Va. 258, 104 S. E. 805; Va. Coal Co. v. Hylton, 115 Va. 418, 79 S. E. 337, Ann. Cas.

1915A, 741; Gathright v. Begley, 200 Ky. 808, 255 S. W. 837.

Holding thus, we find it unnecessary to decide whether the grantee of the mineral estate may tack his possession of the minerals onto the previous possession of his grantor. We express the opinion that this could be done. If, upon vertical severance, as by a sale of a part of the fee of the tract, the grantee may tack his possession to that of his grantor had before sale, we see no reason why this cannot be done where there is a horizontal severance, separating the surface from the minerals. The necessary privity would exist in each instance.

The contentions of cross-defendant Underwood are ruled by the holding in Underwood v. Hogg (Tex. Civ. App.) 261 S. W. 556 (writ of error refused). Under that case a verdict was properly directed against him.

All assignments and cross-assignments not specifically discussed are overruled, and, believing a correct judgment was rendered, an affirmance is ordered.

Affirmed.