Jack MOSS and wife, Appellants,

v.

HOUSTON OIL COMPANY OF TEXAS et al., Appellees.

No. 4968.

Court of Civil Appeals of Texas.

Beaumont.

Dec. 3, 1954.

Rehearing Denied Dec. 29, 1954.

926

Buchanan & Stover, Silshee, for appellants.

Blades, Kennerly & Whitworth, Houston, for appellees.

### R. L. MURRAY, Chief Justice.

This is an appeal from a judgment in the district court of Hardin County rendered on an instructed verdict in favor of the appellees, Houston Oil Company of Texas, et al., against the appellants Jack Moss and his wife, Rebecca Moss. On January 12, 1953, Moss and wife, as plaintiffs, sued Houston Oil Company of Texas and American Republics Corporation in trespass to try title for title to and possession of an undefined 160 acre tract out of the O. C. Nelson League in Hardin County. The appellees Southwestern Settlement & Development Company and Republics Production Company intervened as defendants in the cause. The plaintiffs in the trial court pleaded and relied upon the 10-year statute of limitation, alleging the occupancy of a specific 8 acre tract in the Nelson League and in addition thereto they claim an undefined 160 acres by virtue of their occupancy and possession of the specific 8 acre tract. Houston Oil Company of Texas and American Republics Corporation filed a general denial and a plea of not guilty, and also specially pleaded the 2-3-4-5-10 and 25-year statutes of limitation, Vernon's Ann.Civ.St. arts. 5526, 5507, 5527, 5509, 5510, 5519, and the dominion statute, Article 5519a, Vernon's Annotated Civil Statutes of Texas. These two defendants also pleaded improvements in good faith. Southwestern Settlement & Development Company and Republics Production Company, who intervened as defendants, filed answers identical to those of the other defendants except that the intervening defendants did not plead improvements in good faith.

At the close of all the evidence the appellants Moss filed a motion for instructed verdict for the oil and gas under an undefined 160 acres of land so as to include the land specifically described in the enclosed 8 acre tract, and in the alternative moved for an instructed verdict for the oil and gas under such enclosed specific 8 acre tract. Such motion was overruled by the trial court.

The appellees at the close of all the evidence filed their motion for instructed verdict, which motion was granted by the trial court, and on such verdict judgment was rendered that plaintiffs in the trial court take nothing by their suit against all defendants. From this judgment the appellants have perfected their appeal to this court.

There is in evidence a map of a portion of the O. C. Nelson League which shows the location of the land in controversy, the various tracts of land mentioned, and the physical objects now on the ground. A small replica of said map is attached to this opinion.

Jack Moss and Rebecca Moss were married on May 2, 1902 and immediately thereafter they settled upon a portion of the O. C. Nelson League and built a house, a barn, a sheep pen and fenced a small tract of 6 or 8 acres. This tract included some land owned and possessed by Jesse Moss, adjoining the tract described in appellant's petition and sued for. Jack Moss testified that in pointing out his fence line around the tract sued for, he did not stay on the line but "stayed way inside it." They continuously resided on said tract of land, using, occupying and enjoying it from May, 1902, until January, 1914. At that time they moved from said premises and thereafter made their home in Liberty County, Texas. Since January, 1914 they have not resided upon or been in possession of said land. They have never paid any taxes on said land, have never held under any deed or muniment of title, and their claims are under the 10-year statute of limitation. They also testified that they claimed the 160 acres undefined.

The appellants state in their brief that there is evidence in the record that the home which they built in May, 1902, was on the described specific 8 acre tract out of the O. C. Nelson League (record title of which is in the appellees) but this is incorrect. There is no evidence admitted by the court showing that such house was on the tract sued for. The evidence is that in 1902 the father of the appellant Jack Moss, one Jesse Moss, was the owner of the 147 acre Mary J. Cunningham tract which adjoins the land in controversy on the east as shown by the map mentioned above. The evidence also is that immediately after their marriage Jack Moss and Rebecca Moss lived with his father, Jesse Moss, at his home on the said Cunningham tract while they were building their home. They built their home somewhere near the southwest corner of the Cunningham or Jesse Moss tract. Shortly after Jack Moss and his wife moved away from Hardin County to Liberty County in 1914, their home burned down and has never been rebuilt. The evidence is that at the time of trial the myrtle bush and well are to be found near the southwest corner of the Cunningham tract at the points shown on said map, and the house or home place of the appellants was between the myrtle bush and the well. From the established distances of the bush and the well from the west line of the Cunningham tract the house or at least a large portion thereof was situated on the Cunningham tract, the land owned and possessed by Jesse Moss, father of Jack Moss.

Appellees introduced a chain of title from the sovereignty of the soil into Houston Oil Company covering 4,268 acres of land of the O. C. Nelson League except 160 acres out of the southwest corner of the league conveyed by Thomas J. Word to William Word. The land in suit here is not the 160 acres described in the Word deed and is not a part of the 160 acres. The deed into Houston Oil Company is dated July 31, 1901 and was filed for record August 17, 1901. It purported to convey, together with other land, 4,268 acres of the Nelson League and it contains a recital that it conveys "all of the land owned by the grantor in the survey." The grantor was Texas Pine Land Association and the deed into it is from John P. Irvin and purports to convey 4,268 acres of the Nelson League and contains the recital that it is "the same land purchased by me from H. J. and Justiana Hunter by deed dated July 20, 1881 and of record in Volume J, Page 494 of Hardin County Deed Records." The deed so referred to purports to convey 4,- 268 acres out of the Nelson League and recites that it is the league granted to O. C. Nelson, less 160 acres out of the southwestern part thereof theretofore sold to William Word. Although the deeds in such chain of title do not except the Mary Cunningham or Jesse Moss 147 acre tract and the Mattie Gore et al., 137 acre tract, which lies immediately to the south of such Cunningham tract, these two tracts of land had been conveyed prior to the deed into Houston Oil Company and were not at the time of such deeds' execution in July, 1901 owned by Houston Oil Company's grantor.

On July 17, 1901 Houston Oil Company made a timber contract with John H. Kirby

by the terms of which it sold to him certain pine timber on certain lands theretofore acquired and to be acquired by it. Among the lands conveyed by such timber contract is "about 105,941 acres acquired from Texas Pine Land Association." By the terms of such timber contract Kirby was granted the right to lay and maintain tram and other roads on and over the lands covered by the contract. Texas Pine Land Association in 1898 built a tram road over the western portion of the O. C. Nelson League and also built a section house near the west line of the league. Kirby Lumber Company later bought out the mills and tram roads of Texas Pine Land Association and began to operate them January 1, 1902 and operated the tram road continuously from January 1, 1902 until 1942 when the tram road was taken up.

The appellants introduced in evidence a deed from C. C. Nelson to Isam Parmer dated March 13, 1838. Both parties consider this deed as executed by O. C. Nelson. The deed from Nelson to David Brown (under which appellees hold and claim) was dated November 28, 1837, which date is prior to the date of the Nelson to Parmer deed but the deed from Nelson to Brown was not filed for record in Hardin County until February 14, 1859. It was filed for record in Tyler County, March 16, 1842. Appellees then introduced the chain of title from Isom Parmer into Walter B. Kimball et al., and a judgment in favor of Houston Oil Company against W. B. Kimball et al. for the entire Nelson League, such judgment being dated March 25, 1912. A certified copy of such judgment was filed July 2, 1912 and recorded in the Deed Records of Hardin County July 5, 1912. In Houston Oil Co. v. Kimball, 103 Tex. 94, 122 S.W. 533, by the Supreme Court, it was held that the record title to the Nelson League was not in Houston Oil Company under the deed from Nelson to Brown.

On August 4, 1916 Houston Oil Company conveyed the surface of the O. C. Nelson League to Southwestern Settlement & Development Company. On November 15, 1916 the Houston Oil Company conveyed to Republics Production Company one-half of the oil, gas and other minerals under the O. C. Nelson League.

The appellees in support of their claim of title by limitation to the land in controversy relied upon possession and occupancy of the premises by their tenants for the various limitation periods. Babe Meguez and his wife, Anna, signed an acknowledgment of tenancy to Houston Oil Company on March 23, 1914, such acknowledgment covering the entire Nelson League. They signed another acknowledgment of tenancy on August 2, 1922 to Southwestern Settlement & Development Company, Houston Oil Company, Republics Production Company and Kirby Lumber Company, such acknowledgment covering the entire Nelson League. This acknowledgment of tenancy restricted Meguez to the use of the surface only. Meguez and his wife built a house in 1914 at a place west of the Jack Moss house on the Nelson League near the southwest corner of the Jesse Moss or Mary Cunningham tract of land and moved into such house February 22, 1914 and continued to reside at such place until 1922, at which time they moved from there to a house north of that house where they resided until September, 1929. The first house in which they lived, beginning in 1914, was south of the Jack Moss field and Babe Meguez cultivated that field every year, beginning in 1914, through 1929, and kept the fences in repair.

The appellees paid the taxes on the land in the Nelson League every year for the period from 1914 to 1929. All such payments were made before delinquency except the year 1925 when the taxes were not paid until after delinquency.

Jasper Tanton signed an acknowledgment of tenancy to Houston Oil Company on November 27, 1908, such acknowledgment being for the entire Nelson League. Tanton was living at a place near Franklin Lake in the eastern portion of the Nelson League in 1906 and he continued to live there until his death in March, 1912. Tanton's home was near Franklin Lake on the Nelson League and that portion of the Nelson League is separated from the western

930

portion of the league, including the land in controversy, by the Cunningham and Gore tracts.

By their first point the appellants contend that the trial court erred in granting the appellees' motion for instructed verdict, for the reason that they proved title in themselves under the 10-year statute of limitation to their enclosure as described in paragraph 2 of their petition. By their second point they contend that it was error for the court to grant appellee's motion for instructed verdict for the reason that they had proved title in themselves under the 10-year statute of limitation to an undefined 160 acres to include their improvements and the enclosure described in their petition. We believe that the evidence which is summarized above raised a fact issue for the jury to decide whether the appellants matured limitation title to their enclosure. All of the evidence, from witnesses of both the appellants and appellees, if accepted as true by a jury, would have established the fact that the appellants occupied the enclosed land, cultivated and used it for about 12 years in such a manner as established their title by limitation under the 10-year statute, Vernon's Ann.Civ.St. art. 5510, to the land enclosed, and unless the appellees acquired the land from them by limitation after they moved off the land in 1914, appellants would still have such title to the land.

Appellants entered and began their possession of the enclosed tract in May, 1902. Record title to the Nelson League was not in the appellee Houston Oil Company of Texas until March 25, 1912, the date of the judgment which it recovered against W. B. Kimball et al. for title to the entire Nelson League. Houston Oil Company made no entry upon the enclosed tract sued for until the date of and by virtue of its acknowledgment of tenancy by Babe Meguez and wife in 1914. This restricted them to the use of the land to farming purposes only. Although Houston Oil Company had a deed of record to the entire Nelson League since August, 1901, in view of the judgment of the Supreme Court in

Houston Oil Co. v. Kimball, 103 Tex. 94, 122 S.W. 522, holding that the claimants of title under the Nelson to Isom Parmer deed had a superior title to that of Houston Oil Company, claimants under the Nelson to David Brown deed, Houston Oil Company was not the holder of the record title to the Nelson League nor the 8 acre tract sued for in said league during all the time until March 25, 1912, of the possession and use of the enclosed tract by the appellants Jack Moss and wife. The only possession it took of such tract was possession by Babe Meguez and his wife. After the death of Babe Meguez, his wife, Anna, married Lee Gore and she testified at the trial of the case. We quote the following pertinent parts of her testimony in regard to the occupation by her and Mr. Meguez of the land sued for and the claims they made to the land:

"Q. * * * there has been a plat introduced in evidence here and there has been some testimony that at some time in the past that Mr. Meguez built his house which was located right near the southwest corner of the Jesse Moss or Cunningham tract of land in the O. C. Nelson League. A. Yes, sir.

"Q. Did you and Mr. Meguez live in a house that was located there close to that southwest corner of the Cunningham tract? A. Yes, sir.

"Q. Do you know who built that house? A. The one we lived in?

"Q. Yes, who built it? A. My husband, Mr. Meguez, and old uncle Boney Gore.

"Q. Did you move into that house after you completed it? A. Yes, sir.

"Q. What kind of a house was it? A. A three-room boxed house.

"Q. Now do you know when you all moved into that house? A. Yes, sir.

"Q. When did you move into it? A. The 22nd of February, 1914.

"Q. Mrs. Gore, how do you fix the exact time that you moved into that house? A. Well, I remember that so well on account

of my baby's age. She was born in 1912 and she was two years old when we moved there.

"Q. Her birthday was February 22, 1912. A. Yes, sir.

"Q. And that was her second birthday, the day you moved into that house? A. Yes, sir.

"Q. How long did you continue to live in that house? A. We lived in that house until 1922. I don't remember the day, but it was in 1922.

"Q. Well, now it has been shown by other evidence that Mr. Meguez built another house up here in this location (Indicating). A. Yes, sir.

"Q. Did you all ever live in that house? A. Yes, sir.

"Q. Well, I will ask you whether or not you moved into it when you moved out of this first house down here? A. Yes, sir.

"Q. Then how long did you all continue to live in this second house up there before you moved away from there. Do you know what year you first moved away from it? A. I don't believe I do. Let's see. Yes, I do.

"Q. When was it? A. 1929, in September.

"Q. In September of 1929? A. Yes, sir.

"Q. And where did you move when you left that second house? A. Up close to Spurger, in Tyler County.

"Q. At that time was Mr. Meguez in bad health? A. Yes, sir, he got in bad health that fall.

"Q. The fall of 1929? A. Yes, sir.

"Q. Now, when you all moved out of that second house up there, did anybody move into it shortly after you all moved out? A. Yes, sir.

"Q. Who did move into it? A. My father, G. B. Brown.

"Q. Did you and Mr. Meguez ever move back into that house during his lifetime? A. No, sir.

"Q. How long did your father, Mr. G. B. Brown, live there? A. I don't know just the date he come there, but he come there in the same year and made the crop until the next year and it was all gathered and left.

"Q. He just made one crop? A. Yes, sir.

"Q. And that was evidently during the year 1930 when he lived there and made the crop? A. That's right.

"Q. Did you, after the death of Mr. Meguez, ever move back into that house? A. Yes, sir.

"Q. You testified that he died in March, 1931. Do you remember when you moved back? A. Some time in April. It was about a month.

"Q. When you all moved up to Spurger, did you or not leave some of your things in your house down there? A. Yes, sir, we left some of them.

"Q. You moved back there in April, 1931? A. Yes, sir.

"Q. How long did you continue to live there before you moved away? A. Three years, I think. The best I remember, it was about 1934.

"Q. Now what did you do with the house that was up there, that house you built? What did you do with it? A. I sold it.

"Q. Who did you sell it to? A. To Birchie Ward.

"Q. Did Birchie Ward ever live in it after he bought it from you? A. Yes, sir.

"Q. Then did anyone else live in it following him? A. Yes, sir, I think so. I think Mr. Tom Eason lived in it.

"Q. Tom Eason? A. Yes, sir.

"Q. Now, Mrs. Gore, did you ever know Mr. and Mrs. Jack Moss back here? A. Hardly. I hardly knew them.

"Q. Did you ever know about them living in the vicinity of where Mr. Meguez built your first house? A. I knew of them living there, but that was all.

"Q. Now at the time you all moved to the first place Mr. Meguez built, was the Jack Moss house standing or had something happened to it? A. Something had happened to it. It wasn't there.

"Q. Well, from signs you saw on the grounds from the location of where that house was, could you tell what had happened to it? A. Yes, sir, it had burned.

"Q. Well, the house that Mr. Meguez built wasn't built right where the Jack Moss house burned? A. No, sir.

"Q. Have you recently been up on that location and pointed out to Mr. Lathy, a surveyor, where the old well was at the Jack Moss place? A. Yes, sir.

"Q. Have you pointed out a crepe myrtle bush that was there close to the Jack Moss house? A. Yes, sir.

"Q. Now, when you and Mr. Meguez first moved into that first house, which you say was in 1914, did you find some fencing, a field fenced up there where you all built that house? A. Yes, sir.

"Q. Which way was the fencing from the house? A. It was north, the sides of it running towards the north.

"Q. Was your house built inside of that fence or was it outside? A. Outside.

"Q. Was it south of that fence? A. Yes, sir.

"Q. Which direction did your house face in? A. It faced south.

"Q. And so the field then was back behind the house extending north? A. Yes, sir, that's right.

"Q. Did Mr. Meguez make any use of that field? A. Yes, sir, he cultivated it all the time we were there.

"Q. You moved in there in February, 1914. Did he make a crop in that field there, cultivate that field in the year 1914? A. Yes, sir.

"Q. Did he cultivate that field in the year 1915? A. Yes, sir.

"Q. Did he cultivate it in the year 1916? A. Yes, sir.

"Q. And did he or not continue to make a crop there, cultivate that field or some portion of that field each and every year, including the year 1929 when you all moved up to Spurger in September? A. Yes, sir.

"Q. I will ask you whether or not Mr. Meguez either kept up or rebuilt the fences around that field? A. Yes, sir, he put a lot of wire on them.

"Q. Now, after you all moved there and on after he built the house, was that fencing ever extended southward so as to take in your house, or did you have a separate yard fence? A. We built a yard fence joining this back fence around the house.

"Q. I see. You joined on the fence that was already there and built you a yard fence? A. Yes, sir.

"Q. So that fence you found there constituted your back yard fence? A. Yes, sir.

"Q. Now, when you moved up into the second location did you extend that field fence some so as to take in your second house? A. Yes, sir, we did.

"Q. Extended it? A. Yes, sir.

"Q. Now, Mrs. Meguez * * * I'm sorry * * * I just get confused about names. A. That's all right.

"Q. There has been some testimony here that that field fence that was there was built there by Jack Moss. A. Yes, sir.

"Q. And there has been some testimony that that field also took in a portion of what was then the Jack Moss place * * * I mean the Jesse Moss place. Did you all find fences that came in and fenced in the house of Jack Moss or where his house was? A. Yes, sir.

"Q. That fence was there when you all went there? A. Yes, sir, it was.

"Q. Now, when you sold the house, the second house up there * * * you say you sold it to Birchie Ward? A. Yes, sir.

"Q. Did about that time or before that time or after that time, did you sell any other improvements that you had there? A. Yes, sir.

"Q. What else did you sell? A. I sold a barn.

"Q. Who did you sell that to? A. Hanse Cunningham.

"Q. Did you sell any of the fencing? A. Some of the wire * * * part of it.

"Q. Who did you sell that to? A. To Hanse.

"Q. Now, during all the time that you all lived there, both in the house on the southern location and the house on the northern location, did Mr. Jack Moss ever come there and question your right to be cultivating that land? A. No, sir.

"Q. Well, answer out. A. No, sir.

"Q. Did you ever see Mr. Jack Moss up there in that vicinity during the whole time that you all were living there? A. No, sir. * * *

"Q. Mrs. Gore, when you were living there, were you claiming to own any part of this Jack Moss place? A. Well, the three acres that we bought.

"Q. Out of the Jack Moss place, you were claiming to own that in your own right? A. Yes, sir, we bought three acres.

"Q. And you paid taxes on it, did you not? A. Yes, sir.

"Q. Did you pay taxes on it the whole time that you were living there? A. I think so.

"Q. For all the years that you lived there? A. Yes, sir.

"Q. Are you still paying taxes on it? A. No, sir.

"Q. You quit paying taxes when you left there? A. Yes, sir.

"Q. You sold the three acres to J. N. Collier after your husband, Babe Meguez, died to pay the funeral expenses? A. Yes, sir.

"Q. And you are not now claiming any interest in that three acres? A. No, sir.

"Q. You never did put any deed of record pertaining to that three acres, did you? A. No, sir.

"Q. You were claiming that three acres as your own and in your own right, were you not? A. Yes, sir.

"Q. Against every person in the world * * * I mean as your own and not anybody elses? A. Yes, sir.

"Q. That three acres within the Jack Moss enclosure? A. Yes, sir.

"Q. Did you have any understanding with the Southwestern Settlement & Development Corporation about that three acres? A. I don't think about the three acres.

"Q. Didn't you sign an acknowledgment of tenancy to the Houston Oil Company or Southwestern to some property up there? A. Yes, sir, where we built the house.

"Q. But you didn't include the three acres in that acknowledgment of tenancy? A. No, sir.

"Q. Was that three acres supposed to have been left out of the acknowledgment of tenancy? A. I don't know.

"Q. Did you intend to hold the three acres for the Southwestern or the Houston Oil Company? A. Well, yes, I guess so.

"Q. You were going to give the three acres to the Houston Oil Company? A. We had bought it and paid for it, you see, and we built the house we thought on the land, but it wasn't.

"Q. Wasn't on the three acres? A. No, sir, and then that is when we signed the acknowledgment of tenancy.

"Q. Did the Southwestern Settlement & Development Corporation recognize

your right to the three acres at the time that you signed the acknowledgment of tenancy to the Southwestern? A. I think so.

"Q. Did the one you were dealing with recognize your right to the three acres? A. I think so.

"Q. Who did you deal with when you signed your acknowledgment of tenancy? A. Mr. McClelland.

"Q. And he recognized for the company your right to the three acres? A. I don't know what that means?

"Q. I will try to make it clear to you. When Mr. McClelland told you that you were not building on your land and you would have to sign an acknowledgment of tenancy * * * A. Yes, sir, they came while we were building the house and said it wasn't on our land."

*    *    *    *    *    *

"Q. Then you did claim this three acres then all the time you were there, is that right? A. Yes, sir.

"Q. Paid taxes on it? A. Yes, sir.

"Q. Was the Jack Moss fence down or did you have to rebuilt it? A. It was up.

"Q. How long had Jack Moss been gone? A. I didn't know.

"Q. Had you lived in that neighborhood before you moved there? A. No, sir.

"Q. Where did you live? A. Fuqua, Texas.

"Q. Who did you get the three acres from? A. Lee Gore.

"Q. Then there was a fence around the tract containing about six or eight acres when you went there, is that your testimony? A. I don't know how much land there was. It was a small field.

"Q. Did you ever have your three acres run out? A. No, sir.

"Q. And there was a field fence when you went there over some acreage, you can't estimate the amount of it? A. No.

"Q. Now there wasn't any line down here? (Indicating) You don't know whether this field fence was on the Jesse Moss tract or the Jack Moss tract? A. No, I wouldn't know.

"Q. You just know there was a field out there? A. Some of them said that part of our fence was on a little bit of Jesse Moss's tract.

"Q. Some people told you that? A. Yes, sir.

"Q. How long after you were there? A. I don't remember.

"Q. Then this field, well, we will just say six acres. A. That would be all right.

"Q. Is that about your best estimate? A. Well, I didn't know what an acre was.

"Q. Then your house, how far was it from this fence? This first house, how far south was it from this fence? A. That first house we built there?

"Q. Yes, how far was it? A. Just a little piece * * * about a real, small yard.

"Q. How many feet? A. I couldn't tell you. It has been too long.

"Q. Point to some place in the courtroom showing how far it was to the fence.

"Court: Now, lady you are not confined to an object in this courtroom. If it is farther, say so.

"Q. About as far as from here to this first row of seats? A. Yes, sir, something like that.

"Q. So if your house was there, the fence came down to within thirty feet of your house, or ten yards. A. Yes, sir.

"Q. Just a few steps out of your back door you would strike this old fence that you found? A. Yes, sir.

"Q. And there was no house in this field when you went there? A. No, sir.

"Q. And there was a burned down place over in the southwest corner? A. Yes, sir.

"Q. Now when you went up there in 1922, you contracted to buy that from Southwestern? (Indicating) A. Yes, sir, twelve acres.

"Q. And Mr. DuBois surveyed it out? A. Yes, sir.

"Q. But you never did buy it? A. Mr. Meguez got sick.

"Q. And you never did actually buy it? A. No, sir.

"Q. When you moved up here, there was no fence around that place, was there? A. No, sir.

"Q. How long was it before you put a fence around that place? A. Oh, we put a fence the first year. We fenced it from the field that was already there on to the other place where we lived.

"Q. Then the first year that you moved up here you extended this fence on up to include your house? A. Yes, sir.

"Q. That was in 1922? A. Yes, sir.

"Q. And what did you do, take down this north line of fencing in the old field? (Indicating) A. Yes, sir, we took that out after we got the fence around there. We took out that.

"Q. The north line? A. Yes, sir, that's right.

"Q. And you tore this house down and moved up here and extended your fence on to include it? A. We built a new house up there, and then we tore down the old house and moved it up there and built barns out of it and that is what I sold Mr. Cunningham.

"Q. Then you built this house before you tore this house down? A. Yes, sir.

"Q. And moved up here and extended the fencing? A. Yes, sir.

"Q. Now when you were doing all that, did you raise the crop in this field here that same year? (Indicating) A. Yes, sir.

"Q. While you were moving your house and building fences? A. Yes, sir."

Mr. and Mrs. Meguez were in possession of this enclosed tract of land in August, 1916 when Houston Oil Company conveyed the surface of the Nelson League to Southwestern Settlement & Development Company and in November, 1916, when Houston Oil Company conveyed to Republics Production Company one-half of the oil, gas and other minerals under the Nelson League. We are satisfied that under the authority of Kilpatrick v. Gulf Production Co., Tex.Civ.App., 139 S.W.2d 653; McLendon v. Comer, Tex.Civ.App., 200 S. W.2d 427; Clements v. Texas Co., Tex.Civ. App., 273 S.W. 993, the possession by Meguez and wife continued to operate in favor of and for the benefit of Houston Oil Company and its grantees, Southwestern Settlement & Development Company and Republics Production Company until 1922. In 1922, after the severance in 1916 of the minerals from the surface, Meguez and wife executed another acknowledgment of tenancy to Southwestern Settlement & Development Company, Houston Oil Company of Texas, Republics Production Company and Kirby Lumber Company, all in one instrument. This 1922 acknowledgment of tenancy had the effect of superseding the 1914 acknowledgment and became a new agreement between the parties. We believe this is true because the purported owners in the new instrument were entirely different from those in the first instrument; the instruments covered different period of time and the various parties named as owners or lessors owned and purported to own and were claiming to own severally the surface, separate halves of the minerals, and the right to cut certain timber. In the 1922 agreement the Houston Oil Company was contracting only as to its minerals, and no mention was made of the 1914 agreement and beginning in 1922 with the new agreement the Southwestern Settlement & Development Company, the purported owner and claimant of the surface, contracted directly with Meguez and wife as to the surface. There is no evidence that the Southwestern Settlement & Development Company or the Republics Production Company recognized Babe Meguez and wife as its tenant from the time Southwestern became

the record owner of the surface and Republics became the record owner of one-half of the minerals in 1916 until the 1922 instrument was executed. Meguez and wife made no effort to enter into possession of any of the minerals on the Nelson League by virtue of their 1922 tenancy agreement, and in fact they could not have done so, since they were restricted by the terms of the instrument to the use of the land for farming purposes only.

■ Under the authority of Thomas v. Southwestern Settlement & Development Co., Tex.Civ.App., 131 S.W.2d 31, the only possession that the appellees had after 1922 through the possession of Babe Meguez and wife was the surface by appellee Southwestern Settlement & Development Company. After 1922 Southwestern did not claim possession of the entire fee in the Nelson League through the possession of Babe Meguez and wife and contracted with them only with reference to the surface. For Houston Oil Company and Republics Production Company, Meguez attempted no possession of the oil and gas.

If such an issue had been submitted to a jury in the case, and a jury had found in answer thereto that the appellants had matured title to the enclosure under the 10-year statute of limitation, then the appellees had the burden of showing by competent proof that they had thereafter acquired title to the enclosed tract by limitation. They attempted to do so through their tenants, Meguez and wife. Under the peculiar state of the evidence as outlined above they did not do this as a matter of law and the trial court was in error in granting appellees' motion for instructed verdict as to the enclosed tract.

■ In regard to the appellants' second point, relating to their claim and suit for an undefined 160 acres, including the enclosed tract, we believe that no error is shown. Since the evidence conclusively established that the home which the appellants built at the time they went on the land in 1902 was largely, if not altogether, on the Jesse Moss or Cunningham tract adjoining the proper-

ty sued for, we do not believe that this type of possession and use by the appellants would be sufficient occupancy to show and give notice by adverse possession that the appellants were claiming 160 acres of land adjoining the land actually enclosed and used. See Temple Lumber Co. v. Low, Tex.Com.App., 272 S.W. 769.

The appellees also contend that the use of the tram road across the western portion of the Nelson League by Kirby Lumber Company from 1902 until 1942 was a sufficient entry on the league by Houston Oil Company to restrict the appellants in their limitation claim to the enclosure. There is no showing of any cutting of timber by Kirby Lumber Company in connection with the operation of the tram road in the manner described in the case of Harvey v. Humphreys, Tex.Civ.App., 178 S.W.2d 733. There is also lacking in this case proof that Kirby Lumber Company was the timber vendee or the tenant of the appellee Houston Oil Company, since the timber agreement in evidence is between Houston Oil Company and John H. Kirby. In the proof there is a complete absence of any showing that John H. Kirby was acting for Kirby Lumber Company, although it is such a well known fact in East Texas that John H. Kirby and Kirby Lumber Company were so connected with the timber and lumber business in that area that the court would have strong ground for taking judicial knowledge of the fact that a timber deal with John H. Kirby was also for the benefit of Kirby Lumber Company, but we do not so hold. Appellees rely upon this tram road operation only in support of their contention that such operation served to restrict the appellants' claim to their enclosure. Since we hold that the appellants are restricted to such enclosure for another reason as given above, it is unnecessary to rule upon the effect of such operation of the tram road.

■ Under their seventh point the appellants complain of the action of the trial court in excluding, on the objection of the appellees, evidence tendered at the trial. They offered certain of the proceedings in

the case of Houston Oil Co. of Texas v. Jack Moss et al., No. 2378 in the district court of Hardin County. They offered to show (a) a portion of a judgment in such case dated October 27, 1913; (b) docket sheet from the Motion Docket of said court; (c) of the setting aside the October 27, 1913 judgment; (d) excerpts from plaintiffs' first amended petition and (e) portions of the final judgment in such case dated September 26, 1921. The latter judgment showed dismissal of the cause by the plaintiff Houston Oil Company of Texas without prejudice. That suit involved the same parties and the same land. The offer was made by the appellants to show that Jack Moss's claim to the land was hostile and was in existence as late as the judgment in 1921. The trial court sustained the objection to portions of the record in the old case in Hardin County, but also ruled that he would admit the plaintiffs' first amended petition or such proof thereof as the appellants wished to introduce and he would admit the final judgment in the case. We think the ruling of the trial judge was correct. The pleadings and judgment in the former proceeding between the same parties involving title to the same land were admissible and the trial judge's ruling was not in conflict with such a holding. We find no error in this point.

By its final point Number eight the appellants contend that the trial court erred in overruling their motion for instructed verdict for an undefined 160 acres to include their improvements, said improvements being the enclosure; under the same point they say in the alternative that the trial court should have instructed a verdict in their favor for all the oil, gas and other minerals under their said enclosure. They do not brief this point and adopt the statement and argument under their first point.

We overrule this point and hold that fact issues were raised for the jury to determine as to their limitation title to their enclosure, and the oil and gas thereunder.

■ By their third point the appellants say that because they are asserting a legal title only, that is, a title by limitation, to the land in controversy, laches and abandonment cannot bar their claim and the trial court erred in giving any consideration to paragraph 3 of the appellees' motion for instructed verdict. The statements contained in this point are correct. While the appellees in their motion for instructed verdict pointed out that the appellants Jack Moss and his wife moved away from the land in 1914 and had never been back on it since that time, had never paid any taxes on it or rendered it for taxation, still in their brief in this court they make no reliance on such a ground and apparently state these facts in their statement and argument in opposition to the testimony of Moss that he ever claimed the land in the first place.

We affirm that portion of the trial court's judgment which decreed that appellants take nothing in their suit against the appellees for an undefined 160 acres of land. We reverse and remand that portion of the trial court's judgment decreeing that the appellants take nothing by their suit for the land described in their petition, being the enclosure which appellants claim by occupation, enjoyment and use under the 10-year statute of limitation.

■ The costs of this appeal will be taxed equally against the appellants and appellees, one-half to each.

Affirmed in part and reversed and remanded in part.